# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

| | |
|---|---|
| JAMAL PERRY,<br><br>Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | No. 18-294V<br><br>Special Master Christian J. Moran<br><br>Filed: August 24, 2026 |

Ronald C. Homer, Meredith Daniels, & Patrick Kelly, Conway, Homer, P.C., Boston, MA, for petitioner;
Naseem Kourosh & Adam Muffett, United States Dep't of Justice, Washington, DC, for respondent.

**PUBLISHED DECISION DENYING ENTITLEMENT**[1]

Mr. Jamal Perry alleges the human papillomavirus ("HPV") vaccine he received on May 28, 2015, caused him to develop autoimmune encephalitis. He seeks compensation pursuant to the National Childhood Vaccine Injury Compensation Program.[2]

The vaccination at issue was Mr. Perry's final dose in a three-dose series of the HPV vaccine. Approximately 31 days after this vaccination, Mr. Perry began to experience neurologic symptoms that ultimately resulted in multiple hospitalizations. During the course of his treatment, his providers did not reach a definitive diagnosis. Possibilities included encephalitis, potentially autoimmune in nature, as well as Kleine-Levin syndrome ("KLS"), an idiopathic disorder. Fortunately, Mr. Perry has recovered to near baseline functioning with only minor residual impairments.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

[2] This petition for compensation was initially filed by Mr. Perry's mother, Mrs. Tammie Perry, on his behalf while he was a minor. During the course of litigation, Mr. Perry reached the age of majority and was substituted as the petitioner in this matter. Order, issued Oct. 15, 2020. His mother has also participated in the proceedings as a witness, providing affidavits and hearing testimony. Exhibits 20, 22; Tr. at 1, 4-56. For ease of reference, the term "petitioner" refers to Mr. Perry unless otherwise indicated.

In providing support for his claim, Mr. Perry retained an expert, Yuval Shafrir, M.D., a pediatric neurologist.[3] Dr. Shafrir opined that the HPV vaccine more likely than not caused Mr. Perry to suffer an autoimmune central nervous system ("CNS") process, specifically autoimmune encephalitis. Exhibits 24 & 78.

The Secretary disagrees with this opinion and, in turn, has supported his position with reports from Elaine Wirrell, M.D., a pediatric neurologist.[4] Exhibits B, E, & F. Additionally, the Secretary retained Stephen McGeady, M.D., a pediatrician and immunologist.[5] Exhibits D & G. Together, the Secretary's experts maintained that the HPV vaccine did not harm Mr. Perry and rejected the diagnosis of autoimmune encephalitis: Dr. Wirrell argued that KLS was more likely than not the diagnosis, and Dr. McGready opined that Mr. Perry's symptoms were most likely attributable to an infectious process. Exhibit B at 19; exhibit F at 5; exhibit D at 3; exhibit G at 1.

After the experts disclosed their opinions, the parties joined issue regarding Mr. Perry's diagnosis and causation theory. Joint Preh'g Submission, filed Nov. 17, 2022, at 2. The parties

---

[3] Dr. Shafrir graduated *magna cum laude* from the Sackler School of Medicine at Tel Aviv University. Exhibit 25 at 1. After completing residency training in pediatrics and neonatology, he undertook fellowship training in pediatric neurology, neurophysiology, and epileptology. Id. Dr. Shafrir has been board certified by the American Board of Pediatrics, the American Board of Neurology and Psychiatry with Special Qualification in Child Neurology, and the American Board of Clinical Neurophysiology. Id. at 2. Over the course of his career, he has served in academic medical centers, hospital-based pediatric neurology programs, private-practice, and military medical settings, including service as a Major in the U.S. Army Medical Department and the U.S. Army Reserve. Id. at 2-3. Currently, Dr. Shafrir maintains a private practice specializing in autoimmune encephalopathy and continues to provide care through locum tenens clinical appointments. Tr. at 61:4-18. He has authored several journal articles and abstracts. Exhibit 25 at 3-6. At the entitlement hearing, Dr. Shafrir testified that none of his postgraduate medical training was specialized in immunology and that he was not board-certified in immunology. Tr. at 109:17-22.

[4] Dr. Wirrell earned her medical degree from the University of British Columbia in Vancouver and completed her residency training in pediatrics and child neurology before pursuing specialized fellowship training in pediatric neurology and epilepsy. Exhibit H at 1, 2. She is a Fellow of the American Academy of Neurology as well as a Fellow of the Royal College of Physicians of Canada in both Pediatrics and Neurology. Id. at 1-2. Dr. Wirrell's clinical and research work spans a broad range of neurologic conditions affecting children and adolescents, with particular focus on epilepsy. Presently, Dr. Wirrell serves as a Professor and Chair of Child and Adolescent Neurology at the Mayo Clinic in Rochester, Minnesota, and in an editorial capacity for several journals—including the Journal of Child Neurology. Id. at 1, 3, 5. She has written over 200 peer-reviewed, original articles, and her research interests include behavioral and psychiatric comorbidities in pediatric epilepsy and developmental and epileptic encephalopathies. Id. at 44, 46-65.

[5] Dr. McGeady graduated from Creighton University in Omaha. Exhibit I at 1. His postgraduate training included a residency in pediatrics followed by fellowship training in allergy and immunology at Duke University Medical Center. Id.; Tr. at 346: 18-21. Dr. McGeady went on to become board-certified by the American Board of Pediatrics and the American Board of Allergy and Immunology. Exhibit I at 1. He has held several faculty appointments and is currently a Professor of Pediatrics at Jefferson Medical College in Philadelphia, Pennsylvania. Id. Although semi-retired, he remains actively engaged in the field as the medical director of Children's Heart Hospital and Children's Rehabilitation Hospital of Philadelphia, and as supervisor to physicians seeking subspecialty qualifications in the field of allergy and immunology. Id.; Tr. at 347:10-16. He has authored approximately 60 peer-reviewed publications. Tr. at 348:20-24. In addition to his career in academic medicine and clinical practice, Dr. McGeady served in the U.S. Army, through deployment to Vietnam and service at Fitzsimons Army Hospital. Exhibit I at 1.

thereafter advocated for their positions through briefing and a two-day entitlement hearing, held on December 12-13, 2022. Pet'r's Preh'g Br., filed Nov. 21, 2022; Pet'r's Posth'g Br., filed Aug. 4, 2023; Resp't's Posth'g Br., Oct. 18, 2023.

This case was then reassigned to the undersigned. Order, issued Feb. 24, 2026. Given the stage of the proceedings at the time of reassignment, the views of the parties were sought regarding whether any further case development, including an additional hearing, was appropriate. Order, issued Mar. 10, 2026. Through status reporting, the parties subsequently indicated that the issues were fully litigated and that the matter could be resolved on the current record. Pet'r's Status Report, filed Mar. 27, 2026; Resp't's Status Report, filed Apr. 3, 2026.

A review of the record leads to the conclusion that Mr. Perry is not entitled to compensation. The complicated question of whether he suffered from autoimmune encephalitis[6] as opposed to KLS[7] or another type of encephalopathy[8] need not be answered to rule on entitlement. Even if Mr. Perry had established with preponderant evidence that he suffered from autoimmune encephalitis as his expert asserts, Mr. Perry has not met his burden of establishing that the HPV vaccine caused his autoimmune encephalitis or any other injury.

## I. Facts

The evidentiary record includes medical records, expert reports, supporting medical literature, and fact testimony by affidavit and by live testimony. The contemporaneous records reflect an initial systemic illness followed by the onset of neurologic symptoms and enduring cognitive and behavioral changes. Mr. Perry filed two affidavits from his mother, Mrs. Tammie Perry, who also testified as a fact witness to provide additional context for Mr. Perry's clinical history. Exhibit 20 (affidavit, signed Mar. 5, 2018); exhibit 22 (supplemental affidavit, signed Sep. 19, 2018); Tr. at 4:9-56:15. The parties' positions ultimately turn on competing expert interpretations of both diagnosis and causation.

---

[6] *Encephalitis* refers to inflammation of the brain. Dorland's Illustrated Medical Dictionary 605 (33d ed. 2020). Because Mr. Perry alleges causation-in-fact rather than a Table encephalitis, the regulatory definition is not dispositive. However, it remains a useful reference point for the Program's understanding of the term *encephalitis*. A successful Table claim of encephalitis requires specific evidence of neurologic dysfunction and of an inflammatory process in the brain, and a claim of acute encephalitis must progress to chronic encephalopathy. See 42 C.F.R. § 100.3(c)(3) (definition of *encephalitis*); see also Id. § 100.3(d)(1) (definition of *chronic encephalopathy*). *Autoimmune encephalitis* is a form of encephalitis characterized by inflammation of the brain caused by an aberrant immune response rather than direct infection and may develop following an infectious trigger or through other non-infections processes. See exhibit F, tab 1 (A. Venkatesan et al., Case Definitions, Diagnostic Algorithms, and Priorities in Encephalitis: Consensus Statement of the Internation encephalitis Consortium, 57 Clin. Infectious Disease 1114 (2013)) at 2.

[7] *Kleine-Levin syndrome* "KLS" is a neurologic disorder characterized by episodic periods lasting for several weeks of excessive sleep and often involving overeating, with amnesia of the attacks; it usually occurs in adolescent boys. Dorland's Illustrated Medical Dictionary 1806 (33d ed. 2020).

[8] *Encephalopathy* is a clinical term that describes abnormal brain function or altered mental status, manifesting as confusion, disorientation, behavioral changes, or other cognitive impairments, with or without inflammation of brain tissue. Dorland's Illustrated Medical Dictionary 608 (33d ed. 2020); see also 42 C.F.R. § 100.3(c)(2) (definition of *acute encephalopathy*), (d)(1); exhibit F, tab 1 at 2.

### A. Early Medical History

Mr. Perry was born on October 23, 2001. Pet. at § 2 ¶ 1; exhibit 1 at 1. His early development proceeded normally, and prior to the events at issue, he had no documented history of neurologic illness. Exhibit 2 at 54-56; see exhibit 20 (affidavit) at ¶ 1. His medical history was significant for allergies and asthma, which involved occasional exacerbations and at least one hospitalization. Exhibit 2 at 2-4, 369, 385, 389. During this period, Alison Airall-Ryan, M.D., his pediatrician, also recommended a sleep study after observing intermittent apneic pauses and mouth breathing. Id. at 389, 391-92.

Prior to the subject vaccination, Mr. Perry did not have a formal diagnosis to account for any cognitive or behavioral concerns. The record contains references to anxiety related to sports participation and various remarks from educators related to his distractibility. E.g., exhibit 4 at 13; e.g., exhibit 16 at 64, 73 (noting Mr. Perry had difficulties "staying on task" and in "reading group," describing him as "easily distracted" and "need[ing] to give wrong answers for attention").

His academic records demonstrate consistent, satisfactory performance. The earliest standardized testing results in the record appear to be from September 2009 and indicate that he scored below average on all three tested areas (verbal, quantitative, and nonverbal). Exhibit 16 at 16. His State of Texas Assessments of Academic Readiness ("STAAR") scores, which are used to assess student performance under state curriculum standards and determine readiness to advance to the next grade,[9] were largely satisfactory; the records show that Mr. Perry received unsatisfactory scores only twice—in his April 2013 STAAR mathematics test and in his May 2016 STAAR social studies test. Id. at 89.

With respect to his immunization history, Mr. Perry received his first two doses of the HPV vaccine on August 9, 2013, and July 29, 2014, without reported complication. Exhibit 2 at 326, 329, 394. Central to this matter, on May 28, 2015, at age thirteen, Mr. Perry received his third dose of the HPV vaccine during a sports physical. Id. at 368, 394. That day, Dr. Airall-Ryan noted no health concerns, with the exception of an abnormal visual acuity test and inquiring about his management of his asthma. Id. at 54, 56.

On June 24, 2015, as a part of his evaluation for athletic clearance, Mr. Perry was seen by a cardiologist, Dr. Theodore Carlson, who found his presentation entirely normal. Id. at 49-50. Mr. Perry reported no symptoms, specifically denying "excessive easy fatigue." Id. at 49. He was cleared for athletic participation and was described as a "very healthy and athletic young man." Id. at 50.

---

[9] Texas Education Agency, Information for Parents About the STAAR Test, All About the STAAR Test (date accessed: August 24, 2026), https://www.texasassessment.gov/staar-about.html.

### B. Initial Symptoms

On June 29, 2015, approximately 32 days after his third HPV vaccination, Mr. Perry presented to the emergency department ("ED") at Texas Regional Medical Center, where his mother, Mrs. Tammie Perry, reported that he was disoriented, experiencing dizziness, and "'not acting right.'" Exhibit 2 at 317.[10] Mr. Perry's Glasgow Coma Scale[11] score was assessed at 14, with one point deducted for confusion, and later improved to 15. Id. at 320. Laboratory findings were generally unremarkable, with a mildly elevated anion gap and normal white blood cell count. Id. at 322, 324. The treating physician observed that Mr. Perry appeared withdrawn and exhibited a flat affect. Exhibit 2 at 320. The physician also documented that his parents refused a recommended psychiatric consultation, and that Mrs. Perry expressed the view that his symptoms were attributable to allergy-induced vertigo, electing not to pursue further emergent evaluation. Id. Mr. Perry ultimately left the hospital against medical advice. Id. at 318, 320; accord exhibit 20 (affidavit) at ¶ 4.

The following day, June 30, 2015, Mr. Perry returned to his pediatrician. Dr. Airall-Ryan documented a four-day history of fever, with a reported maximum temperature of 103°F, along with nausea, vomiting, and evolving neurologic symptoms, including hallucinations and a two-day history of altered mental status ("AMS").[12] Exhibit 2 at 365. His parents questioned whether his symptoms were related to having recently resumed taking montelukast, a medication given to reduce or prevent bronchoconstriction, despite prior known tolerance. Id.

On examination, Dr. Airall-Ryan did not record a fever or directly observe hallucinations. Id. at 365-66. She found that Mr. Perry was oriented to person and place and appeared in "no apparent distress." Id. at 366-67. However, she noted that he was "laughing inappropriately" and was "asking inappropriate questions." Id. at 366 (alteration in original). Having reviewed the ED records and completing her assessment, Dr. Airall-Ryan formulated a differential diagnosis that

[10] The exact onset of symptoms is difficult to pin down. Mr. Perry appeared to be in good health at his appointments with Drs. Airall-Ryan and Carslon on May 28, 2015, and June 24, 2015, respectfully. In her affidavit, Mrs. Tammie Perry recounted that "[a]t the end of June 2015, [her son] complained that he was not feeling well." Exhibit 20 (affidavit) at ¶ 2. She added that on June 29, 2015, Mr. Perry "woke up screaming in his room," after which he was brought to the ED that same day. Id. at ¶ 3. At his pediatrician's office on June 30, 2015, it was reported that Mr. Perry had a four-day history of fever, which, if accepted as the first manifestation of the alleged injury, would place the date of onset at June 26, 2015, which is approximately 29-30 days post-vaccination. Exhibit 2 at 365. After leaving the pediatrician's office for the ED, it was reported that Mr. Perry's course began five days prior with a 2-day history of fever, nausea and vomiting, suggesting a potential onset date of approximately 28-29 days post-vaccination. Exhibit 3-1 at 8, 12. Mrs. Perry was reported to have first noticed Mr. Perry "acting funny" on "Sunday evening," i.e., June 28, 2015, which bolsters the position that onset occurred approximately 31 days post-vaccination. Id. at 41. Ultimately, the outcome of the case does not turn on whether the onset of neurologic symptoms was 28 days, 32 days, or someplace in between.

[11] The *Glasgow Coma Scale* is a standardized neurologic assessment tool that assigns numerical values to a patient's responses to stimuli; a score of 15 is normal, while lower values reflect increasingly severe clinical impairment. Dorland's Illustrated Medical Dictionary 1645 (33d ed. 2020).

[12] *Altered mental status* ("AMS") is defined in medical literature as decreased or altered level of consciousness, lethargy, or personality change. E.g., exhibit B, tab 12 (Francesc Graus et al., A Clinical Approach to Diagnosis of Autoimmune Encephalitis, 15 Lancet Neurol. 391 (2016)) at 3.

included psychosis, viral encephalitis, and drug abuse. Id. at 367. Mr. Perry was then referred to the ED at Children's Medical Center Dallas. Exhibit 20 (affidavit) at ¶ 5; see exhibit 3-1 at 7-13.

### C. First Hospitalization

#### 1. June 30, 2015

On June 30, 2015, Mr. Perry presented to the ED at Children's Medical Center Dallas. Carla Cash, M.D., a resident, and Drew Scott Weiner, M.D., an ED Attending Physician, first assessed Mr. Perry. They noted that Mr. Perry's reported fevers, nausea, vomiting, and intermittent headaches had resolved. Exhibit 3.1 at 11-12. The physical examination was normal except for psychiatric-categorized findings including a blunt affect, delayed speech, inattentiveness, and "abnormal recent memory." Id. at 11. While initiating a broad workup, Dr. Weiner noted a low suspicion for meningitis in the absence of supporting symptoms and indicated that a psychiatric etiology was most likely. Id. at 12.

*CT Imaging*

The initial diagnostic workup included a non-contrast computed tomography ("CT") scan of the head to evaluate for acute intracranial pathology. Exhibit 3.1 at 14, 290-91. The imaging was unremarkable, providing no explanation for Mr. Perry's symptoms and prompting clinicians to continue evaluating other potential causes of his neurologic symptoms. Id.

*Social Work Consultation and Lorazepam*

Lindsay Perrone, a licensed clinical social worker, evaluated Mr. Perry in the ED with his family present. Exhibit 3.1 at 26. Mr. Perry's father reported episodes of inappropriate laughter and questions, while his mother suggested that his sister's recent return home from college may have been a stressor that contributed to his emotional state. Id. Although Mr. Perry was oriented to person, place, and time, was able to identify family members, and denied suicidal or homicidal ideation as well as audiovisual hallucinations, he was emotionally labile and inconsolable throughout the assessment, requiring administration of intravenous ("IV") lorazepam, a psychotropic medication. Id. at 13, 15, 26, & 169. LCSW Perrone noted the family's agreement to pursue psychiatric follow-up. Id. at 26.

Mr. Perry was soon thereafter admitted for medical management with a primary diagnosis of AMS and with both psychiatry and neurology involved as consulting services. Id. at 18, 25.

#### 2. July 1, 2015

Eron Shall Linver, M.D., the admitting physician, assessed Mr. Perry and provided a summary of his initial presentation. Exhibit 3.1 at 19-25. During Dr. Linver's examination, Mr. Perry was oriented to person, place, and time, though he was noted to have cried "during most of the exam." Id. at 21. Continuing with his neurologic assessment, Dr. Linver found that Mr. Perry's reflexes and muscle tone were normal and that his balance and proprioception were intact. Id. at 22. Dr. Linver, nonetheless, described the exam as "[v]ery inconsistent," observing

that Mr. Perry "[a]t times… walk[ed] normally, [and] at other times seem[ed] very unsteady." Id. Dr. Linver's impression was that Mr. Perry's symptoms were most consistent with a psychiatric condition. Id. at 25.

*MRI, Lumbar Puncture, and Other Diagnostics*

Mr. Perry underwent magnetic resonance imaging (an "MRI") of his brain without IV contrast. Exhibit 3.1 at 89-90. No intracranial abnormalities to account for AMS were detected, and the findings were interpreted as "unremarkable" overall. Id. at 40, 90.

To further investigate the cause underlying Mr. Perry's presentation, various laboratory studies were done.[13] Cerebrospinal fluid ("CSF") was obtained via a lumbar puncture, with results consistent with a traumatic tap, or the introduction of peripheral blood during the procedure rather than true bleeding within the central nervous system. Id. at 40, 60-61. The nucleated cell count, which may include white blood cells ("WBCs"), was 2 cells/mm$^3$, and the CSF protein was mildly elevated at 59.76 mg/dL. Id. at 40. CSF cultures were negative, as were toxicology screening and testing for *Mycoplasma pneumoniae*, enterovirus, West Nile virus, and cytomegalovirus. Id. at 275, 280, 284-87. Epstein-Barr virus ("EBV") serology appeared consistent with prior, but not acute, infection.[14] Id. at 134. A respiratory viral panel, paraneoplastic antibody panel, and autoimmune encephalopathy panel, which included testing for N-methyl-D-Aspartate ("NMDA") receptor antibodies, were also negative. Id. at 250-51, 275, 282-83; exhibit 10 at 1.

*Psychiatry Consultation and Olanzapine*

Sonal Patel Prasad, M.D., a fourth-year resident and child and adolescent psychiatry fellow, accompanied by Meredith Rene Chapman, M.D., an attending physician, provided a psychiatric assessment. Exhibit 3.1 at 27-33. At the start of the examination, Mr. Perry was calm and cooperative; however, he became inconsolably tearful and attempted to remove his peripheral IV catheter and to leave his room. Id. at 34. He was given a one-time dose of rapid dissolving olanzapine, a psychotropic medication, to "help him remain calm and to keep him from leaving." Id. at 34, 169. Dr. Prasad learned from Mr. Perry's parents that these episodes, "characterized by emotional lability… distress, and confusion," "usually last for 5 minutes." Id. at 34.

[13] Though samples were collected during Mr. Perry's time at Children's Medical Center Dallas, some of the tests were performed at an outside laboratory; results for these tests were not immediately available. E.g., Exhibit 3.1 at 251 (reflecting that the sample used for the paraneoplastic antibody panel was prepared on July 3, 2015, received at the testing site on July 7, 2015, and resulted on July 10, 2015).

[14] Later in Mr. Perry's course, on July 22, 2015, Mrs. Tammie Perry called Children's Medical Center Dallas for guidance, and her request was forwarded to the neurology service. Exhibit 3-2 at 756. One of Mr. Perry's treating neurologists suggested that Mr. Perry "may have initially gotten [Epstein-Barr virus] and had an infection" during the June 30-July 5, 2015 hospitalization; the neurologist suggested at the time of the call that Mr. Perry may have "a post-infectious encephalitis," although confirmation is "hard" to provide without "seeing him." Id.

Dr. Prasad made note of Mr. Perry's sister having had also experienced gastrointestinal symptoms a week before onset of his neurologic symptoms, but, unlike Mr. Perry, his sister "did not have any alterations in her mood or mental status." Id.; but see exhibit 22 (supplemental affidavit) at ¶ 3 (recounting that Mr. Perry's sister "experienced similar symptoms" to him and "was admitted to the hospital with confusion and uncontrollable crying in early July of 2015.").[15]

Dr. Prasad rated the severity of Mr. Perry's psychiatric symptoms as follows: Mr. Perry exhibited moderate anxiety and hyperactivity; moderate severe uncooperativeness, nervous tension, and confusion; and severe distractibility. Exhibit 3-1 at 30-31. Mr. Perry again denied having hallucinations, paranoia, delusions, obsessions, or a sense of hopelessness, and his thought content was found to be within normal limits. Id. at 30-32. Dr. Prasad summarized her findings, opining that Mr. Perry's presentation was "most consistent with delirium" and advised that his care team pursue identifying any underlying organic etiology. Id. at 31.

*Neurology Consultation*

Stacey Labiner, M.D., a fifth-year resident and pediatric neurology fellow, under the supervision of Michael Morgan Dowling, M.D., an attending physician, conducted a neurologic assessment. Exhibit 3.1 at 40-49. On examination, Mr. Perry was described as "agitated, but redirectable," at times tearful and repeatedly asking to remove his IV catheter and to leave, appearing unable to retain explanations given moments earlier for the purpose of the IV. Id. at 42. His cranial nerves were intact, and motor examination showed normal strength in all extremities. Deep tendon reflexes were normal, and no sensory deficits were noted. Aside from emotional lability and distractibility, the only abnormal finding was intermittent gait instability. Although his gait was described as "[i]mbalanced," Dr. Labiner observed "no true ataxia." Id. at 45.

At the time of this assessment, an electroencephalogram ("EEG") had not yet been performed, and send-out laboratory tests, including serum and CSF testing for NMDA receptor antibodies, were still pending. Id. at 282-83. Based on only the clinical presentation and history, Dr. Labiner expressed a "strong suspicion" for anti-NMDA receptor encephalitis or another form of encephalitis, noting that Mr. Perry presented with nonspecific "viral prodrome." Id. at 48.

Dr. Dowling similarly assessed the presentation as consistent with limbic or autoimmune encephalitis and recommended further evaluation. Id. at 40. At the same time, he raised the possibility of initiating empiric therapy[16] for autoimmune encephalitis even before the results of that workup would be returned. Id. at 41. Both providers also recommended pharmacologic management of Mr. Perry's mood with quetiapine, a psychotropic medication, with Dr. Labiner noting that "[m]any children with encephalitis respond well to [quetiapine.]" Id. at 47-48.

[15] This psychiatric consult took place on July 1, 2015, and one of Mr. Perry's sisters was admitted for encephalopathy on July 4, 2015. Exhibit 3-1 at 147, 148, 153; see also exhibit 5 at 94 (noting that Mr. Perry's "sister had similar viral symptoms when [Mr. Perry] initially presented with his first hospitalization.").

[16] *Empiric therapy* refers to treatment administered based on a suspected diagnosis rather than a confirmed one. Dorland's Illustrated Medical Dictionary 1883 (33d ed. 2020).

3. July 2, 2015

*Quetiapine*

Although autoimmune therapy would not be administered during this admission, Mr. Perry was started on twice-daily quetiapine, and, at least once, he was given a dose PRN,[17] specifically in response to escalating agitation. Exhibit 3.1 at 116, 170. At that time, nursing staff documented that he was crying, pacing, and repeatedly requesting his mother and removal of his IV catheter. Nursing staff noted that he took the medication willingly but remained distressed. After his mother arrived, the IV was removed, and environmental stimulation was reduced, nursing staff observed that his condition then improved. Id.

*EEG*

An EEG was performed in the morning of July 2, 2015. It was abnormal, capturing intermittent right temporal polymorphic delta slowing during both states of wakefulness and drowsiness. Exhibit 3 at 61-64. This finding was interpreted as a nonspecific indicator of focal cerebral dysfunction, most commonly associated with structural abnormalities, but also seen in potentially reversible conditions such as postictal states or migraines. Id. at 63.[18] Dr. Dowling assessed the EEG results as consistent with his working diagnosis of limbic or autoimmune encephalitis. Id. at 72. He noted that the CSF and serum studies remained pending, while again raising the possibility of initiating empiric therapy for autoimmune encephalitis in advance of confirmatory results. Id.

4. July 3, 2015

On the morning of July 3, 2015, Dr. Labiner reassessed Mr. Perry and found him alert and oriented, with no report of agitation since the night before. Exhibit 3.1 at 119. She noted that he remained somewhat distractable and that, per parental report, he was not at baseline. Id. Additionally, Dr. Labiner documented that Mr. Perry had experienced difficulty with sleep. Id.

Upon examination later that day, Dr. Dowling similarly observed overall improvement. Id. He noted that Mr. Perry, despite answering orientation questions appropriately, continued to exhibit inattention, hyperactivity, and aloofness. Id. Dr. Dowling seemed to attribute Mr. Perry's improvement to quetiapine, of which it appears that only a single dose had been administered at this point during Mr. Perry's hospitalization. Id. at 170.

Following remote consultation with neuroimmunology and review of Mr. Perry's clinical presentation and his history of suspected viral prodrome, the neurology team came to a

---

[17] *Pro re nata* ("PRN") is a Latin phrase meaning "in the circumstances," indicating an intervention given when necessary rather than on a fixed schedule. Dorland's Illustrated Medical Dictionary 1492 (33d ed. 2020).

[18] Mr. Perry has no history of migraines. Mr. Perry was reported to have had nausea, mood changes, and a "10/10 headache" the day before presenting to the ED; he denied having aura or visual changes. Exhibit 3.1 at 8.

consensus that Mr. Perry was experiencing autoimmune encephalitis. Id. at 120, 122-24. On that dual basis, notwithstanding the absence of confirmatory laboratory results,[19] Dr. Dowling recommended proceeding with plasma exchange ("PLEX")[20] and initiated preparations for the therapy, including ordering a surgical consult for central line placement. Id. at 49, 120.

5. July 4, 2015

In the early morning of July 4, 2015, Mr. Perry again became agitated. Nursing staff described an "emotional outburst" occurring after his father and sister experienced "acute mental status changes," requiring their evaluation as outpatients in the ED; though his father reportedly did not require hospitalization, his sister was ultimately admitted for encephalopathy that day. Exhibit 3-1 at 147, 148, 153; exhibit 22 (supplemental affidavit) at ¶ 3 (discussing his sister's hospitalization); Tr. at 52:20-53:14 (discussing his father's symptoms). At his mother's request, nursing staff obtained a dose of quetiapine PRN; however, before it was administered, family members were able to calm him, and the medicine was held. Id. at 147.

Despite this episode, nursing documentation reflects that Mr. Perry remained neurologically intact, as he was oriented, able to follow commands, and exhibited no focal deficits. Given that Mr. Perry had been near baseline from his parents' perspective for approximately 24 hours and was apparently redirectable, his father questioned the need for PLEX, and the primary service was notified of his concern. Id. at 148, 153.

Vineeta S. Mittal, M.D., a general pediatrics attending physician, thereafter reassessed Mr. Perry and documented no evidence of psychosis or confusion, concluding that he had returned to baseline. Id. at 150. In light of this improvement, the primary team elected to defer PLEX and to continue observing Mr. Perry clinically. Id. at 153.

The neurology team similarly documented Mr. Perry's return to baseline.[21] Id. at 153, 156. Dr. Labiner summed up her examination stating that Mr. Perry was a "drastically different child from a few days ago [and was] no longer agitated, distractible, and cooperate[d] easily." Id. She suggested that the transient neurologic symptoms might reflect an exposure-related process, particularly given that Mr. Perry's sister appeared to have developed similar symptoms and had

---

[19] Of note, Dr. Dowling recommended proceeding with treatment for autoimmune encephalitis even after NMDA receptor antibody testing of serum and CSF samples yielded negative results, which weighed against a diagnosis of autoimmune encephalitis. Exhibit 3.1 at 120.

[20] *Plasma exchange* ("PLEX") may be used as a first-line treatment which aims to remove (apparently harmful) antibodies from withdrawn blood and adds replacement fluid to the blood before returning it to the patient. Cleveland Clinic, Plasmapheresis and Plasma Exchange (last accessed August 24, 2026), https://my.clevelandclinic.org/health/treatments/24197-plasmapheresis-plasma-exchange. Dr. Shafrir stated that PLEX is an effective treatment for only antibody-mediated encephalitis, explaining that "[PLEX] doesn't help any other forms of encephalitis." Tr. at 72:14-24.

[21] Diana Patricia Castro, M.D., another attending physician from the neurology service, supervised Dr. Labiner at this time. Dr. Castro attested to being present for Mr. Perry's physical examination and to discussing the care plan and diagnosis with his caregivers. Exhibit 3.1 at 153.

been admitted for encephalopathy.[22] Neurology agreed with deferring PLEX and recommended only quetiapine on an as-needed basis. Id.

6. Discharge

Mr. Perry was discharged on July 5, 2015, approximately 38 days post-vaccination. In her discharge summary, Dr. Mittal documented that Mr. Perry remained at baseline. Exhibit 3.1 at 160. She suggested that his symptoms were "possibly secondary to a viral syndrome" and recommended that he follow up with neurology and his primary care provider. Id. at 160, 162.

**D. Second Hospitalization and Outpatient Care**

1. Telephone Encounters with Children's Medical Center Dallas

Approximately 55 days post-vaccination, on July 22, 2015, Mr. Perry's mother, Mrs. Tammie Perry, called Children's Medical Center Dallas for guidance from the neurology service. Exhibit 3.2 at 754. A triage nurse returned her call and took down her concerns, noting that "when [Mr. Perry] was discharged… [he] was acting like himself and playing outside, and 'now he is very tired and confused' … [and] not acting like himself." Id. at 755. There was no fever or nausea associated with this episode. The nurse documented Mr. Perry's current symptoms as "some of the same symptoms he had when he was previously admitted to the hospital," including "disorientation, tiredness, and confusion." Id. The nurse advised that Mr. Perry be evaluated in the ED. Id.

A physician from the psychiatry department, Meredith Rene Chapman, M.D., called Mrs. Tammie Perry that afternoon. She memorialized Mrs. Perry's report:

> [Mr. Perry] had returned to his baseline state of health after discharge until yesterday when he became more emotional and stated 'something's not right.' Mother reports [Mr. Perry] slept from 4PM yesterday until 10AM today when parents aroused him. Since being awake she describes [Mr. Perry] as tearful, emotional, and 'distressed.' He could be heard crying in the background and calling for his mother… Mother is concerned that [Mr. Perry's] current symptoms may represent anxiety as she notes several potentially stressful events that preceded symptom onset including older brother returning to college and the start of football camp.

Id. at 757. Dr. Chapman recommended urgent psychiatric assessment either via presentation to an emergency department or to a psychiatric facility. Id.

2. Medical City Dallas Hospital, July 22-26, 2015

---

[22] Mrs. Tammie Perry stated that the contemporaneous medical records discussing Mr. Perry's family members contained many inaccurate statements. For example, the records refer to Mr. Perry's *younger sister*, however, Mr. Perry is the youngest sibling in the family. Exhibit 22 (supplemental affidavit) at ¶ 1. Mrs. Perry reported that only one of her daughters—the daughter who received her third HPV vaccination on the same day as Mr. Perry—experienced neurologic symptoms similar to those Mr. Perry had developed. Id. at ¶¶ 3-5.

Though Mrs. Tammie Perry indicated that she would take her son to a psychiatric hospital with an assessment center, she instead brought him to the ED at Medical City Dallas Hospital. Exhibit 3.2 at 757; exhibit 4 at 17-26. ED Physician Siew Lee, M.D., and ED Certified Physician Assistant Melody Williams, P.A., oversaw his emergency medical assessment.

*LP, EEG, Imaging, and Other Diagnostics*

Upon arrival, Mr. Perry was alert and oriented, "crying but consolable." Exhibit 4 at 19. Examination and initial workup were largely unremarkable, aside from mildly elevated CSF protein and a low-level alcohol reading of 0.01%, despite denial of alcohol use. Id. at 35. The infectious workup was likewise negative, except for indication of past EBV infection. Throughout the assessment, Mr. Perry underwent an EEG, brain MRI, and head CT, which were all interpreted as normal. Id. at 99, 145-46.

*Midazolam, Lorazepam, and Cetirizine*

Mr. Perry was administered IV midazolam, a psychotropic medication, after which he slept for most of the night. Exhibit 4 at 42, 154. The following morning, he again exhibited marked emotional lability, including crying, screaming, and repeatedly requesting family members. Id. at 35. Neurologic assessment remained largely normal, though he intermittently appeared unsteady while walking, ambulating normally at other times. Id. at 37. The care team summed up his presentation as most consistent with severe anxiety or a psychiatric condition following an acute EBV infection, potentially exacerbated by stressors at home, and administered lorazepam for agitation or anxiety at various times throughout his hospital stay. Id. at 41, 157, 158, & 160.

Mr. Perry was also given cetirizine, Mr. Perry's daily allergy medication, multiple times throughout his hospital stay. Id. at 155, 159. The medication would ultimately be discontinued on July 25, 2015. Id. at 14. The discharging physician noted that cetirizine is associated with neuropsychiatric side effects and that Mr. Perry had restarted the medication 1 to 2 days "prior to relapsing." Id. The physician also recounted that the family confirmed improvement after discontinuing the medication; accordingly, it was recommended that Mr. Perry stop taking systemic antihistamines.[23] Id.

*Discharge*

The discharging physician listed "recurrent AMS" and possible adverse effects related to cetirizine use as the final diagnoses. Exhibit 4 at 14. The family was instructed to observe Mr. Perry "off of [cetirizine] for a few more days" and to follow up with his primary care physician; a psychiatry referral was given, to be used as needed. Id. at 14-15, 16.

[23] Mr. Perry had also received multiple doses of cetirizine during his first admission at Children's Medical Center Dallas. Exhibit 3.1 at 169. Of note, however, the records reflect that Mr. Perry had a return of neurologic symptoms in the absence of cetirizine, leading a treating physician to conclude that the medication "is unlikely to be the cause of his symptoms." Exhibit 3.2 at 793 (entry dated August 13, 2015).

3. Follow-up Appointments with Pediatrician

Later that week, on July 31, 2015, Mr. Perry followed up with his pediatrician, Dr. Airall-Ryan. Exhibit 2 at 294-96. Upon examination, she found Mr. Perry to be alert and "back to baseline." Id. at 296 (alteration in original). Cetirizine was not listed among his active medications and was listed among his known allergies. Id. at 360. In light of Mr. Perry having had now two episodes, Dr. Airall-Ryan referred him to neurology. Id. at 296. In the interim, Dr. Airall-Ryan evaluated Mr. Perry again on August 5, 2015, documenting no abnormalities on examination. Id. at 359-61.

**E. Third Hospitalization and an Additional ED Visit**

Prior to the third hospitalization, which began approximately 75 days after vaccination, Mr. Perry was reportedly in his usual state of health. Exhibit 3-2 at 783. A neurology note from this period, authored by Alison Dolce, M.D., a neurology attending physician, indicated that between episodes, Mr. Perry returned fully to baseline, with normal mood, behavior, and sleep. Id. at 794.

The evening before presenting again to Children's Medical Center Dallas, Mr. Perry was exercising with family members when he began to feel "odd," a sensation that he likened to prior episodes. Id. at 763. He subsequently took a nap at home, and his parents reported that he was difficult to arouse and, upon awakening, was "not acting right," asking disoriented questions, including asking where his mother was while she was present with him. Id. He was then brought to the ED with a chief complaint of AMS. Id. at 763.

1. Children's Medical Center Dallas, August 12-14, 2015

Upon arrival on August 12, 2015, ED Physician Kalpesh Nanu Patel, M.D., observed that Mr. Perry was oriented and under no apparent distress. Exhibit 3.2 at 767. Physical examination demonstrated that his reflexes were normal, without cranial nerve deficits, and he demonstrated normal muscle tone and coordination. Id. The only noted abnormality was that he appeared "not very interactive." Id.

The initial workup revealed that Mr. Perry had elevated liver enzymes, prompting further evaluation. Id. at 784. The neurology team, who was consulted, observed that this transaminitis was mild and improving when compared to previous lab work. Id. at 829. Additionally, hepatic ultrasound and coagulation studies were normal, suggesting a transient process possibly related to a toxic or medication-related exposure, although no clear source was identified. Id.

Jennifer J. Johnston, M.D., who admitted Mr. Perry for "spells," noted that, despite the laboratory abnormalities, Mr. Perry was clinically well-appearing, as he remained alert and fully oriented, as evidenced by repeatedly normal neurologic examinations. Id. at 792. Given his "complete recovery" between episodes, Dr. Johnston considered encephalitis as less likely than

other possibilities.[24] Id. The differential instead included episodic conditions such as partial seizures or migraine, with other possibilities including toxic or psychiatric causes remaining under consideration. Id. at 792-93.

*Neurology Consultation and Third EEG*

Neurology was consulted, first by phone, resulting in the initiation of levetiracetam, an anticonvulsant, as a precaution against possible seizure activity and a recommendation to admit Mr. Perry. Exhibit 3-2 at 793, 817.

Later that day, Kristen Arrendondo, M.D., a third-year neurology resident, under the supervision of Dr. Dolce, conducted an in-person evaluation. Id. at 799. By the following morning on August 13, 2015, Dr. Dolce saw Mr. Perry and spoke with his parents, who reported that "he is much more himself but that he still seems sleepy." Id. at 794. Drs. Arrendondo and Dolce found his neurologic examination was normal, with no gait abnormalities or abnormal movements. Id. The neurology team recommended a repeat EEG, with consideration of further imaging or lumber puncture pending results. Id. at 795. The EEG was subsequently performed and was normal. Id. at 814-16.

*Psychiatry Consultation, Lorazepam, and Olanzapine*

On August 14, 2015, Mr. Perry experienced an episode of emotional lability, prompting administration of lorazepam. Exhibit 3.2 at 785. Around this time, he was also evaluated by psychiatry. Id. at 799-806. His thought content was found to be within normal limits, with no evidence of hallucinations, delusions, paranoia, or obsessive or depressive themes. Id. at 812. During the evaluation, however, he became acutely distressed and required significant reassurance from his mother. Id. at 801.

When the treatment team returned to talk with his parents, Mr. Perry experienced another episode of emotional distress, repeatedly stating that he needed his family, Jesus, and help. Id. Despite attempts at redirection and reassurance, he remained highly agitated and was administered rapid dissolving olanzapine. Id. Psychiatry concluded that Mr. Perry did not meet criteria for inpatient psychiatric admission but recommended outpatient psychotherapy. For ongoing agitation, the team advised the use of olanzapine as needed and emphasized the importance of psychiatric follow-up after discharge. Id. at 800, 806

*Discharge*

Mr. Perry was discharged on August 14, 2015. Exhibit 3.2 at 783-785. By that time, his providers appeared to favor psychiatric etiology over a diagnosis of encephalitis. E.g., id. at 783, 826. Dr. Dolce noted that during episodes of distress, Mr. Perry remained fully oriented, aware of his surroundings, and able to answer questions appropriately. Id. at 826. Neurologic examinations were all unremarkable, as was the repeat EEG. In light of these findings, Dr. Dolce stated, "I would not expect a true encephalitis to have such prolonged periods of normalcy and

[24] Mrs. Tammie Perry disputed this characterization of his recovery being complete at the hearing. E.g., Tr. at 27:18-23, 35:1-36:3.

despite the patient's events (which look like panic attacks) he remains oriented and aware of his surroundings." Id.

The hospitalist Dr. Linver, who had served as the admitting physician on July 1, 2015, wrote the discharge summary and listed "[sp]ells" and "[an]xiety [di]sorder" as the final diagnoses. Id. at 783. Mr. Perry's parents were advised to follow up with his primary care provider and outpatient psychiatry. Id. at 783, 786.

2. Cook Children's Hospital, August 15-16, 2015

The following day, Mr. Perry presented to the ED at Cook Children's Hospital for evaluation of AMS. Exhibit 5 at 92. Hannah Smitherman, M.D., an ED physician, noted a report of "episodes of crying 'hysterically'…sleepiness, [and] confusion" since having been discharged the day before, and that he sought "another opinion." Id. at 10, 93. Dr. Smitherman documented that Mr. Perry had received one dose of olanzapine prior to ED arrival; his neurologic examination was normal. Id. at 95. No fever, gastrointestinal symptoms, rash, or additional related concerns were reported. Id. at 94.

*Repeat EEGs and Reevaluations*

Neurologic evaluation included both a routine and 12-hour video EEG, which were normal. Exhibit 5 at 240-43. Background activity was normal, with no focal slowing or epileptiform abnormalities. During the study, Mr. Perry exhibited multiple behavioral events, including head movements, kicking, and screaming, though none of which had an electrographic correlate. Id. at 242. These findings were interpreted as supportive of "paroxysmal nonepileptic events (likely pseudoseizure)." Id.

In the morning of August 16, 2015, Dr. Smitherman began discussing discharging Mr. Perry because he was described as "acting well" and at baseline. Id. at 96-97. By the afternoon, however, Mr. Perry became "progressively active and uncomfortable." Id. at 97. Dr. Smitherman noted:

> Patient kicking and screaming. Asking for his mom. He is generally aware of his environment (when his arm is held over his head, it does not fall on him, he just keeps kicking and screaming and tantruming, he is aware that his mom has stepped out). He cannot verbalize any specific pain. He denies any specific complaints. He remains tearful and extremely agitated. He is lying on his abdomen on the stretcher kicking and yelling. [The nurse] and I asked dad and brother to step out of room. Patient is aware of this as he changes his ranting to "i want my family', "i want my dad". He is asked if he feels safe [at] home or if there is anything bothering him. He does not answer but continues to ask for his family. He is given opportunity to discuss with us any concerns. When family is brought back into room he calms slightly.

Id.

Dr. Smitherman considered Mr. Perry's ED course, reviewed the records from his previous admissions and ED presentations, and consulted subspecialty services (neurology, gastroenterology, and metabolic/genetic), concluding that Mr. Perry's was a "complicated case…

associated with nonspecific EEG changes and mildly elevated liver enzyme elevations." Id. at 96-97. She advised that his treatment team "must consider primary psychotic break/disorder," such as somatoform or malingering disorders, though she acknowledged that clearing him from a medical standpoint was "very difficult." Id. at 97. Dr. Smitherman also concluded that a primary neurologic diagnosis was "unlikely." Id.

*Discharge*

By late afternoon, August 16, 2015, Dr. Smitherman transferred care to Carey C. Cribbs, M.D., an ED physician. Exhibit 5 at 98. Upon reassessment, Dr. Cribbs noted:

> [Mr. Perry] is very agitated. I spoke with parents about EEG results and need for inpatient treatment. They are very adamantly opposed to inpatient treatment. They do not want him separated from them and refused a dose of IV [lorazepam]. They said they have just "wasted 16 hours" here. Mother says he has appointment with their [primary care provider] in the morning and she would rather take him there. A long conversation then ensued with [the psychiatric assessment team] and parents repeatedly said that they could do anything he would get [in an inpatient setting] at home. They insist on having him discharged and refuse transfer/admission to psychiatric facility even after being told that he needs to see a psychiatrist and find a medication that will help him control his outbursts and anxiety. I have to stress that no stone was unturned in this investigation of his mental status and parents were very strongly encouraged to allow us to transfer him.

Id. at 99. In the evening, however, Dr. Cribbs reported that the family "would like him transferred to [a psychiatric] facility" or would otherwise seek psychiatric care after discharge. Id. at 62, 100.

### F. Fourth Hospitalization

The records reflect that, prior to discharge, inpatient psychiatric care for Mr. Perry was recommended, but not obtained. See exhibit 3.3 at 1081; exhibit 5 at 62, 100. After discharge, the family appears to have made additional efforts to obtain psychiatric placement, which were likewise unsuccessful, and ultimately sought emergency care. Exhibit 3.3 at 1060. On August 17, 2015, Duncanville EMS responded to a call, finding Mr. Perry "holding onto his dad and yelling help me Jesus." Exhibit 14 at 1. EMS reported being "unsuccessful controlling [Mr. Perry]," who was then given intranasal midazolam to calm him; EMS later released him to Children's Medical Center Dallas. Id. at 2, 4.

#### 1. August 17-18, 2015

Upon ED arrival, Mr. Perry was markedly agitated and anxious, crying out for God and his parents and requesting medications. Exhibit 3.3 at 1081. Review of systems was notable for lethargy, sleep disturbance, hyperactivity, agitation, and anxiety, while physical and neurologic examinations were unremarkable, and Mr. Perry remained oriented to person, place, and time. Id. at 1081, 1083,1063-64.

*Psychiatry Consultation and Psychotropic Medications*

Mr. Perry remained agitated while in the ED and was treated with intranasal midazolam, rapid dissolving olanzapine, and IV lorazepam, spaced approximately thirty minutes apart. Exhibit 3.3 at 1073-74, 1081, 1247. After stabilization, he was admitted for further evaluation. Due to the lack of available psychiatric beds and the need for additional medical workup prior to psychiatric placement, he was admitted to a medical service. Id. at 1080.

The psychiatry service evaluated Mr. Perry and noted his perseveration on religious themes and his parents, but documented no hallucinations or delusions; thought content was characterized as being within normal limits. Id. at 1139. As Mr. Perry continued to exhibit agitation and anxiety, treatment with chlorpromazine and risperidone, both psychotropic medications, were initiated. Id. at 1080, 1247, 1249. For the duration of his hospital stay, Mr. Perry was prescribed risperidone on a twice-daily schedule. Id. at 1143.

*Neurology Consultation*

The neurology service, supervised by Dr. Dolce, again evaluated Mr. Perry. Exhibit 3.3 at 1155-57. Dr. Dolce also observed Mr. Perry as he underwent a psychiatric interview, during which he experienced a prolonged episode of agitation lasting over 40 minutes and required four-point restraints for safety. Id. at 1123. Despite these signs of distress, Dr. Dolce noted that he remained aware of his surroundings and was able to engage coherently. Id. The episode improved with emotional support from his mother and administration of chlorpromazine. Id.

Following their evaluation, the neurology service recommended additional studies, including a repeat lumbar puncture to trend protein levels,[25] but did not recommend immunotherapy at that time. Id. at 1129-30. Dr. Dolce emphasized that the clinical course was not consistent with encephalitis, noting Mr. Perry's intact awareness during episodes, prolonged periods of normalcy, and lack of corroborating findings on prior imaging and EEGs. Id. at 1120-21.

2. August 19, 2015

*Repeat EEG*

The following day, a repeat EEG demonstrated focal slowing in the right parietal region, a nonspecific finding associated with localized cerebral dysfunction that is also seen during seizures and migraines. Exhibit 3.3 at 1130-33. Mr. Perry had been treated with both chlorpromazine and risperidone and remained clinically stable, with preserved cognition and with no further episodes of agitation. Id. at 1132, 1155, 1247, 1249.

*Third LP*

Dr. Mittal performed the LP, which again showed elevated CSF protein. Exhibit 3.3 at 1251-1262. Throughout the procedure, Mr. Perry was "quiet and did not have agitation." Id. at

[25] The lumbar puncture demonstrated elevated CSF protein, while a repeat autoimmune encephalopathy panel was negative. Exhibit 3.3 at 1170, 1154; exhibit 10 at 2.

1158. In light of the persistently elevated CSF protein and EEG findings, and despite their nonspecific nature, the neurology service elected to initiate an empiric trial of intravenous methylprednisolone, a corticosteroid. Id. at 1155. Psychiatry was also asked to continue active involvement for symptom management. Id. at 1155, 1157.

3. August 20-24, 2015

*Methylprednisolone and Risperidone*

On August 20, 2015, neurology re-evaluated Mr. Perry and noted no further periods of significant agitation. Exhibit 3.3 at 1179. He was described as doing well overall, with clear thinking, good recall, and a normal neurologic examination. Id. at 1180. Despite this clinical improvement, an empiric course of IV methylprednisolone was initiated; risperidone was also continued. Id. at 1181, 1247, 1249.

During the hospitalization, Mr. Perry remained clinically stable, with no recurrence of agitation and continued intact cognition. Id. at 1194. Both steroid therapy and risperidone were maintained. Drs. Dolce and Dowling observed that it was unclear which intervention, if any, had been responsible for Mr. Perry's improvement, noting that risperidone had been initiated prior to steroids and that the benefit of empiric immunotherapy was difficult to assess. Id. at 1194, 1213-14.

4. Discharge

Methylprednisolone infusions continued through August 24, 2015, as did administrations of risperidone, at which point Mr. Perry was discharged. Exhibit 3.3 at 1247, 1249. At this time, he was reported by both his family and his neurology team to have returned to baseline and to feel well. Id. at 1211, 1218. Dr. Dowling, the attending neurologist at the time of discharge, indicated that the underlying etiology remained uncertain, and gave a differential diagnosis that included autoimmune encephalitis, seizure-related processes, and a primary psychiatric condition. Id. at 1214. The hospitalist who completed the discharge summary, listed "[a]ltered mental status, thought to be due to possible autoimmune encephalitis" as the final diagnosis. Id. at 1077-79. Mr. Perry was discharged on risperidone with instructions to follow up with both neurology and psychiatry services.

**G. Outpatient Care: September 2015-June 2016**

1. Pediatrician Visits

The following week, on September 2, 2015, Mr. Perry was seen by Dr. Airall-Ryan, was without complaint, and was found to have a normal neurologic examination. Exhibit 2 at 356-58. The next day, he returned with a sore throat, tested positive for streptococcal infection, and was treated with antibiotics. Id. at 353-55. Documentation from this visit also reflects that risperidone had been added to his list of current medications. Id. at 354. Approximately one month later, on November 9, 2015, he returned for a sports clearance evaluation, and the examination was normal. Id. at 350-52. Risperidone was still listed as an active medication. Id. at 351.

2. Pediatric Neuropsychology Visit

More than six months after vaccination, on December 11, 2015, Mr. Perry underwent evaluation by Saima Kayani, M.D., a pediatric neuropsychologist. Exhibit 3.4 at 1912-17. At that time, his physical examination was normal, and his mother reported that he had largely returned to baseline, as evidenced by his attending school, earning good grades, and functioning well overall. His mother expressed some residual concerns, including anxiety related to homework, occasional need for repetition of information, and intermittent staring episodes occurring several times per week. Id. at 1913, 1915-16. While it had been approximately 15 weeks since Mr. Perry's last exacerbation requiring emergent care and hospitalization, Dr. Kayani's differential diagnosis included immune-mediated encephalopathy, post- or para-infectious processes, and acute mania. Id. at 1916. She recommended further evaluation with video EEG, neuropsychological testing, and behavioral counseling, and advised against contact sports due to concern for a possible concussion-related process (he had been playing football since the age of 5). Id. at 1913, 1917. Of note, risperidone was not listed among his current medications at this visit. See id. at 1912.

*Outpatient EEG*

A subsequent four-hour video EEG was conducted on January 6, 2016, and was normal. Exhibit 3.4 at 1933-36. At follow-up with Dr. Kayani on April 27, 2016, Mrs. Tammie Perry reported continued academic success but described a change in personality, including increased withdrawal and reduced social engagement. Id. at 1954; see also exhibit 16 at 89 (listing Mr. Perry's STAAR test scores, demonstrating that he received 44% and 72% on his April 2015 STAAR Mathematics test and Reading test, respectively, and that he received 46% and 69% on his March 2016 STAAR Mathematics test, and Reading test, respectively). Dr. Kayani continued to recommend neuropsychiatric testing and the avoidance of contact sports. Exhibit 3.4 at 1955, 1959.

3. Middle School Academic Performance

The table below highlights information contained in Mr. Perry's report cards from middle school, during which symptom onset began between grades seven and eight:

| Grade/Year | "EXCELLENT" Final Scores | "VERY GOOD" or "PASSING" Final Scores | "FAILING" Final Scores | Attendance Information |
|---|---|---|---|---|
| Grade 6 (2013-14) | • Physical Education (95) | • Science (76)<br>• Language Arts (85)<br>• Reading (77)<br>• Math (72)<br>• Art (87) | | • Excused Absences: 7<br>• Unexcused Absences: 4<br>• Tardy: 4 |

| Grade/Year | "EXCELLENT" Final Scores | "VERY GOOD" or "PASSING" Final Scores | "FAILING" Final Scores | Attendance Information |
|---|---|---|---|---|
| | | • Social Studies (74) | | |
| Grade 7 (2014-15) | • Boys Athletics (100)<br>• Teen Leadership (90) | • Science (80)<br>• English (81)<br>• Journalism/ Newspaper (87)<br>• Math (82)<br>• Texas History (74) | | • Excused Absences: 9<br>• Unexcused Absences: 8<br>• Tardy: 2 |
| Grade 8 (2015-16) | • Boys Athletics (100)<br>• Modern Music (90) | • Science (77)<br>• English (82)<br>• US History (73) | • Bus Info Mgt (62)<br>• Math (65) | • Excused Absences: 10<br>• Unexcused Absences: 10<br>• Tardy: 13 |

Exhibit 16 at 17-19.

4. Pediatrician Visits

Approximately one-year post-vaccination on May 24, 2016, at a well-child visit with Dr. Airall-Ryan, Mrs. Tammie Perry again reported that her son was generally doing well, though she noted ongoing behavioral changes, including increased withdrawal. Exhibit 2 at 36-38. Dr. Airall-Ryan advised against contact sports and referred Mr. Perry to neurology for further evaluation of behavioral concerns. Id. at 41. In a subsequent visit for a sore throat on June 22, 2016, Mr. Perry again tested positive for streptococcal infection and was treated with antibiotics. Id. at 342-43.

5. Section 504 Determination

On September 27, 2016, Mr. Perry's mother spoke with Valerie Roper, M.S., his high school counselor, reporting that he was experiencing "some very serious side effects from Viral Encephalitis and [his associated] medications." Exhibit 16 at 90. Ms. Roper noted behaviors that he was reportedly unable to control, including "blurting out, agitation, constant movement, and occasional memory loss." Id. An inquiry was made as to whether his medical concerns would support a Section 504 determination.[26]

[26] A *Section 504 determination* is the process by which a school identifies whether a student qualifies as having a disability under Section 504 of the Rehabilitation Act of 1973. A student is considered to have a disability

While the records do not appear to contain Mr. Perry's high school grades or any standardized testing results from this period,[27] observations were provided by three of Mr. Perry's high school teachers. Exhibit 16 at 91-94. His English teacher noted that Mr. Perry "either refuse[d] to participate in class [and] distract others, or he [would] lash out [at the teacher] and become angry if he [did] not get his way." Exhibit 16 at 91. The teacher recounted Mr. Perry stating that "no teachers should give him low grades because all of his work is essentially flawless… [and] the state would automatically pass him." Id. His biology teacher noted that Mr. Perry "like[d] to walk around[,] get attention… [and] blurt out occasionally unnecessarily." Id. at 93. His algebra teacher described him as having "trouble staying in his seat" and as "constantly blurting out random comments to get attention from classmates." Id. at 94.

Minutes from the 504 committee deliberations reflect that Mr. Perry's mother participated in the evaluation and indicated that he has health issues "as a result of viral encephalitis… [and] [p]ossible brain trauma from football." Id. at 80. On November 3, 2016, a notice of Section 504 Evaluation Results was issued. Id. at 74-87. The Section 504 Committee determined that it was appropriate to place Mr. Perry in regular education with Section 504 services. Id. at 74. The Accommodation Plan provided that Mr. Perry would be seated near a teacher and given reminders to stay on track; no accommodation was determined to be necessary for STAAR testing. Id. at 81, 83. Additionally, a Behavior Intervention Plan was implemented at this time to address behavioral concerns. Id. at 82.

### H. Remainder of 2016 and More Recent Medical Records[28]

Beyond twelve months post-vaccination, Mr. Perry continued to experience intermittent episodes of AMS, between which he experienced returns to baseline or near baseline, that required both inpatient and outpatient care. Although details of these encounters varied, the overall clinical picture remained consistent: episodic behavioral and cognitive symptoms in the setting of largely normal neurologic examinations and diagnostic testing. Providers continued to consider a broad differential, including autoimmune, neurologic, and psychiatric etiologies, though no unifying diagnosis was definitively established during this period.

---

if the student has a physical or mental impairment that substantially limits one or more major life activities, such as learning, walking, or concentrating, compared to peers without disabilities. The determination is made by a school's 504 committee, which reviews evaluation data, medical or psychological records, teacher observations, and input from caregivers to decide whether accommodations or supports are necessary to ensure equal access to education. (Texas Education Agency 504 Guide) (last accessed on August 24, 2026) https://tea.texas.gov/academics/special-student-populations/special-education/504-guide.pdf.

[27] In a March 31, 2017 neurology consult note, Dr. Labiner documented that on the previous day Mr. Perry had gone to school "like normal because they had STAR (sic) testing, but the school called [his] mom and reported [that] he slept through almost all his classes. He came home and slept more." Exhibit 3.9 at 4225, 4231-32.

[28] This section of records tracks Mr. Perry's course from approximately one- to four-years post-vaccination. The medical records created beyond six months post-vaccination are relatively less valuable in determining whether the HPV vaccine harmed Mr. Perry. Thus, these records are described more summarily. For additional details, see Pet'r's Posth'g Br. at 21-38; Resp't's Posth'g Br. at 13-31.

Between July 2016 and June 2017, Mr. Perry was hospitalized on seven occasions for evaluation and treatment of behavioral and cognitive symptoms. A summary of these hospitalizations is provided below. Some of the admissions involved diagnostic testing, including EEG monitoring, MRI imaging, CT scans, and study of samples obtained via lumbar puncture.

| **Fifth Hospitalization**: July 3-11, 2016 (approximately eleven months after his fourth hospitalization) | | |
|---|---|---|
| Diagnosis | Key Testing | Treatment and Outcome |
| • *Reason for Admission*: Drowsiness, agitation. Exhibit 2 at 207.<br>• *Final Diagnosis*: Drowsiness, agitation. Exhibit 2 at 207. | • MRI was normal. Exhibit 3.4 at 1992.<br>• EEG was normal. Exhibit 2 at 208.<br>• LP showed mildly elevated CSF protein. Exhibit 2 at 208.<br>• Autoimmune encephalopathy panel was normal. Exhibit 10 at 4. | • Five-day course of IV methylprednisolone administered. Exhibit 2 at 208.<br>• Twice-daily, oral risperidone reinitiated. Exhibit 2 at 208-09.<br>• *Condition at Discharge*: Stable, improved. Exhibit 2 at 209. |

At a post-hospitalization follow-up appointment with Dr. Airall-Ryan on July 15, 2016, Mr. Perry's mother reported that he was back to baseline, aside from trouble sleeping. Exhibit 2 at 32. Dr. Airall-Ryan referred Mr. Perry to a neuroimmunologist. Id. at 34.

| **Sixth Hospitalization**: Aug. 12-13, 2016 | | |
|---|---|---|
| Diagnosis | Key Testing | Treatment and Outcome |
| • *Reason for Admission*: Cold symptoms and agitation. Exhibit 3.6 at 2884.<br>• *Final Diagnosis*: Agitation. Exhibit 3.6 at 2897. | | • A course of oral prednisone, a corticosteroid, was initiated with a taper to be completed on an outpatient basis. Exhibit 3.6 at 2898.<br>• Twice-daily oral risperidone was continued. Exhibit 3.6 at 2899.<br>• *Condition at Discharge*: Stable, agitated and tearful. Exhibit 3.6 at 2898. |

| **Seventh Hospitalization**: Aug. 15-21, 2016 | | |
|---|---|---|
| Diagnosis | Key Testing | Treatment and Outcome |

| | | |
|---|---|---|
| • *Reason for Admission*: Agitation. Exhibit 3.7 at 3020-21.<br>• *Final Diagnosis*: Altered level of consciousness. Exhibit 3.7 at 3055. | • EEG was normal. Exhibit 3.7 at 3100-02.<br>• LP showed mildly elevated CSF protein. Exhibit 3.7 at 3103-04, 3285. | • IV lorazepam. Exhibit 3.7 at 3193, 3195.<br>• Continuation of oral prednisone taper. Exhibit 3.7 at 3058, 3196.<br>• The dosage of the twice-daily oral risperidone was titrated down with plans to discontinue the medication. Exhibit 3.7 at 3196-97.<br>• Oral gabapentin was initiated for anxiety. Exhibit 3.7 at 3090, 3104.<br>• Oral amitriptyline was initiated for headache prophylaxis. Exhibit 3.7 at 3058, 3193.<br>• A four-day course of IV Immune Globulin ("IVIG") was ordered, and the treatment scheduled for the first day was canceled. Exhibit 3.7 at 3193.<br>• Mr. Perry was noted to be "at his neurologic baseline" after the first night of hospitalization and prior to initiation of IVIG. Exhibit 3.7 at 3058.<br>• *Condition at Discharge*: "Good." Exhibit 3.7 at 3061 |

On October 7, 2016, Pediatric Psychiatrist Jill Bracken, D.O., assessed Mr. Perry in an outpatient clinic setting. Exhibit 17 at 2. Both physical and psychiatric examinations were normal. Id. at 3. Dr. Bracken's diagnosis was mood disorder due to known physiological condition with mixed features and disruptive mood dysregulation disorder. Id.

On December 9, 2016, Neuroimmunologist Andrew Hurd, M.D., supervised by Benjamin Greenberg, M.D., an attending neuroimmunologist, assessed Mr. Perry in an outpatient clinic setting. Exhibit 3.8 at 3719, 3725. Per their recommendation, Mr. Perry received his first dose of IV cyclophosphamide ("Cytoxan"), a chemotherapy medication given to treat autoimmune encephalitis, on December 15, 2016. Exhibit 3.8 at 3808.

On December 19, 2016, Mr. Perry's father called Children's Medical Center Dallas to report that Mr. Perry had experienced another episode, with a period of agitation earlier in the day. Id. at 3811.

Mr. Perry tested positive for influenza on February 1, 2017, with documented fever and report of fatigue, and was given a five-day course of oseltamivir. Id. at 3926.

| **Eighth Hospitalization**: Feb. 6-7, 2017 | | |
|---|---|---|
| Diagnosis | Key Testing | Treatment and Outcome |
| • *Reason for Admission*: Mr. Perry was admitted for influenza, continued fatigue—despite having slept for "a majority of the past 5 days" per parental report—and confusion. Exhibit 3.8 at 3926, 3933.<br>• *Final Diagnosis*: The discharging provider noted that Mr. Perry's symptoms were likely due to the influenza infection or side effects related to the oseltamivir course. Id. | | • The neurology service recommended "no treatment at this time." Exhibit 3.8 at 3934.<br>• *Condition at Discharge*: Stable. Id. at 3936. |

On February 10, 2017, Neuroimmunologist Ram Narayan, M.D., supervised by Dr. Greenberg, evaluated Mr. Perry in clinic. Exhibit 3-9 at 4090, 4095. Mr. Perry's mother reported that he had been exhibiting confusion since having an influenza infection the previous week and that he had been "sleeping a lot." Id. at 4091. She also stated that his performance at school had improved recently. Id.

On March 7, 2017, Mr. Perry received his second dose of Cytoxan. Exhibit 3.9 at 4112-13.

| **Ninth Hospitalization**: Mar. 31-Apr. 4, 2017 | | |
|---|---|---|
| Diagnosis | Key Testing | Treatment and Outcome |
| • Reason for Admission: Fatigue, decreased activity, and poor appetite. Exhibit 3.9 at 4193.<br>• Final Diagnosis: Encephalopathy, | • LP attempted in the ED on March 31, 2017. Exhibit 3.9 at 4235-36.<br>• EEG, performed on April 1, 2017, was normal. Exhibit 3.9 at 4236-38. | • In the context of the failed LP, midazolam was given. Exhibit 3.9 at 4204. Agitation continued after administration, and Mr. Perry was noted to perseverate on his IV |

| | | |
|---|---|---|
| agitation, and decreased activity.[29] Exhibit 3.9 at 4203. | • Elevated serum ammonia noted. Exhibit 3.9 at 4199. | catheter, repeating "Oh lord, please take it out, please take it out, get it out, I wanna go home." Id. at 4234.<br>• Dr. Linver treated Mr. Perry with olanzapine during only the first two nights of his admission. Exhibit 3.9 at 4203.<br>• *Condition at Discharge*: Stable, "back to baseline." Exhibit 3.9 at 4203, 4207. |

On April 28, 2017, Mr. Perry had a follow-up visit with the neuroimmunology service. Exhibit 11 at 1, 10. Michelle Devine, M.D., a third-year neurology resident, supervised by Dr. Greenberg, noted "significant concern for ongoing behavioral and cognitive issues that did not exist until the past several months." Id. at 12, 14. Dr. Devine characterized Mr. Perry's diagnosis as a "presumed sero-negative autoimmune encephalitis vs Kleine-Levin syndrome," and the treatment team agreed to "continue supportive care and monitor symptoms without additional immunomodulation at this time." Id. His mother consented on his behalf to include Mr. Perry in a longitudinal case-control study with Dr. Greenberg listed as an investigator. Id. at 18-32

| **Tenth Hospitalization**: Apr. 29-May 3, 2017 | | |
|---|---|---|
| Diagnosis | Key Testing | Treatment and Outcome |
| • Reason for Admission: Increased sleepiness (Mr. Perry had been reportedly sleeping and difficult to arouse for approximately 15 hours) and decreased appetite. Exhibit 11 at 65, 78, 84.<br>• Final Diagnosis: The discharge summary listed | • The workup pursued was recommended by the neuroimmunology service and per parental request. Exhibit 11 at 87.<br>• An awake and drowsy EEG was performed on April 30, 2017; the results were normal. Exhibit 11 at 92-95. | • Only supportive treatment was provided.[30] Exhibit 11 at 82, 84, 122.<br>• Mr. Perry was described as "improving without treatment." Exhibit 11 at 133. Dr. Greenberg recommended no further intervention and agreed that Mr. Perry was ready |

[29] The discharge summary, cosigned by Dr. Linver, noted that, the neurology and neuroimmunology services "raised the question that [Mr. Perry] may be exhibiting features of Kleine-Levin [s]yndrome, which is self-limiting, instead of autoimmune encephalitis and [decided] to observe [Mr. Perry] for spontaneous improvement. [Mr. Perry] did subsequently spontaneously improve and on day of discharge, was back to his baseline" without need for additional immunomodulation. Exhibit 3.9 at 4204; see also exhibit 11 at 10.

[30] After conducting an April 30, 2017 follow-up assessment of Mr. Perry, Tonia M. Sabo, M.D., a pediatric neurologist, noted: "My impression is that the child may be depressed and decided to sleep in on Saturday and the family took that to imply her (sic) was in one if his 'sleeping modes'." Exhibit 11 at 83-84. It was reported at this time that Mr. Perry's mother was recorded as indicating that she "thinks he [was] sad because he [had] been restricted from playing sports and he used to be a star football player." Id. at 85.

| | | |
|---|---|---|
| somnolence and encephalitis as the diagnoses, noting in the reported history that petitioner "carries a diagnosis of presumed seronegative autoimmune encephalitis versus [KLS]." Exhibit 11 at 74, 75. | • LP was performed on May 1, 2017; protein CSF was elevated, and the nucleated cell count was 2 cells/mm3. Exhibit 11 at 76, 126.<br>• Although Dr. Greenberg recommended testing the CSF sample for specific proteins, he had not found a laboratory that would run the tests. Exhibit 11 at 137.<br>• On May 2, 2017, no significant findings resulted from MRI of the brain, both with and without contrast, or from MR spectroscopy. Exhibit 11 at 76, 222-24. | for discharge. Exhibit 11 at 137.<br>• *Condition at Discharge*: Stable. Exhibit 11 at 135. |

The day after Mr. Perry's care team (which had included Dr. Greenberg) cleared Mr. Perry for discharge, Sixth Year Resident and Autoimmune Neurology Fellow Dr. Cynthia X. Wang, M.D., and Dr. Greenberg recommended that Mr. Perry be directly readmitted to receive inpatient plasmapheresis therapy, or PLEX. Exhibit 11 at 571-72, 582-84. Upon arrival, Mr. Perry was described as "[a]lert but resting, appear[ing] tired." Id. at 572.

| **Eleventh Hospitalization**: May 4-13, 2017 | | |
|---|---|---|
| Diagnosis | Key Testing | Treatment and Outcome |
| • Reason for Admission: Pet. Ex. 11 at 583-84 Petitioner was readmitted to Children's Medical Center Dallas as a direct admit for PLEX and for continuing somnolence. Exhibit 11 at 582-84.<br>• Final Diagnosis: discharged with a diagnosis of "[s]omnolence, direct admission for PLEX for history of [AE]." Pet. Ex. 11 at 571 | • Jennifer L. Fuchs, M.D., a hospitalist attending physician, assessed Mr. Perry on May 12, 2017, noting that he was sleeping, but arousable with a flat affect. Exhibit 11 at 683. He was reported to continue perseverating on his hemodialysis ("HD") catheter. Id. at 685. | • A percutaneous HD catheter was placed on May 5, 2017, providing vascular access for PLEX. Exhibit 11 at 584.<br>• On May 5, 2017, PLEX was completed, after which Mr. Perry became agitated and attempted to remove his HD catheter; PRN lorazepam was given in response. Exhibit 11 at 616, 620-21. Mr. Perry was also administered olanzapine |

| | | |
|---|---|---|
| | | on May 5, 2017. Id. at 733.<br>• Additional rounds of PLEX were completed on May 7, 9, 11, and 13, 2017. Exhibit 11 at 632, 648, 673, and 697.<br>• *Condition at Discharge*: Improved. Exhibit 11 at 573. Mr. Perry was instructed to begin taking mycophenolate ("CellCept"),[31] an immunosuppressive medication, on a once-daily schedule. Id. at 573. |

On May 16, 2017, Alison Wilkinson-Smith, Ph.D., a psychologist, evaluated Mr. Perry. Exhibit 11 at 1394-1404. Her evaluation revealed that Mr. Perry continued to "struggle with memory and cognitive efficiency" and was "developing a negative attitude." Id. at 1398-99. Dr. Wilkinson-Smith's recommendations included special education services in light of his medically related absences, possible counseling for mood issues, and use of organizational aids. Id. at 1399.

On May 17, 2017, Tanya Martinez-Fernandez, M.D., a pediatric pulmonologist, assessed Mr. Perry in the sleep medicine clinic at Children's Medical Center Dallas. Exhibit 11 at 1427-1433. Dr. Martinez-Fernandez recommended continuing risperidone with agitation, which had "been shown to improve agitation in some patients with KLS" and trialing modafinil, a CNS stimulant.[32] Id. at 1433.

On July 7, 2017, Drs. Wang and Greenberg reevaluated Mr. Perry. Exhibit 11 at 1453-56. His mother reported that since Mr. Perry's most recent hospitalization, "his personality [was] back and he [was] more motivated to participate in activities." Id. at 1454. The doctors maintained the diagnosis of "presumed sero-negative autoimmune encephalitis vs Kleine-Levin syndrome". Id. at 1455. They recommended that Mr. Perry take CellCept for two years, as well as vitamin D3. Id. at 1456.

On November 15, 2017, Mr. Perry went to a Sleep Clinic follow-up appointment. Exhibit 76 at 9. Sleep Medicine Fellow Hisham Hamdan, M.D., noted that the sleep study demonstrated

[31] *Mycophenolate mofetil* ("CellCept") is an immunosuppressive agent commonly used to prevent transplant rejection. Dorland's Illustrated Medical Dictionary 1199 (33d ed. 2020).

[32] *Modafinil* is a central nervous system stimulant used in the treatment of narcolepsy, obstructive sleep apnea, and sleep disorders associated with shift work. Dorland's Illustrated Medical Dictionary 1155 (33d ed. 2020).

moderate obstructive sleep apnea[33] with hypercapnia and recommended using an AutoPAP[34] "every night all night." Id. at 14. On January 2, 2018, a technologist contacted the family by telephone and spoke with Mrs. Tammie Perry who confirmed that Mr. Perry had not been using his AutoPAP. Id. at 135. On March 21, 2018, another technologist spoke with Mrs. Tammie Perry, who relayed that Mr. Perry "does not want to use the machine." Id. at 162.

On November 17, 2017, Mr. Perry had a neuroimmunology follow-up appointment. Exhibit 76 at 40. Dr. Wang noted that although Mr. Perry was taking CellCept twice daily, his "family [felt] like he [was] beginning to show signs of prior AMS episodes." Id. at 43. On exam, he was noted to be apathetic and "tired appearing" with poor insight. Id. at 42. Plans were made to obtain an MRI and EEG and to wean off of amitriptyline. Id. at 43.

Between November 20, 2017, and November 27, 2017, Mrs. Tammie Perry exchanged several electronic messages with Denise Maddox, RN, a representative of the Patient Medical Advice Request Pool at Children's Medical Center Dallas, who relayed the messages to Dr. Greenberg. Exhibit 76 at 54-75. Mrs. Perry was concerned about her son, who was excessively sleeping and exhibiting a decreased appetite. Id. at 56. He reportedly became agitated and asked to go to the hospital, and Mrs. Perry felt she "had no choice but to give him [olanzapine] to calm him down." Id. at 57. Mr. Perry was also "sleeping in [his parents'] room… afraid something [was] going to happen to him." Id.

An outpatient EEG was performed on November 27, 2017, showing a normal occipital dominant rhythm with intermittent right temporal delta slowing, a finding "most often seen with underlying structural abnormalities but may also be associated with potentially reversible causes such as following a focal seizure or in association with migraine." Id. at 97. A subsequent MRI, performed on November 30, 2017, was normal. Id. at 113.

Between December 28, 2017, and January 9, 2018, Mrs. Tammie Perry and RN Maddox exchanged more electronic messages. Exhibit 76 at 121-134. Mrs. Perry reported that her son was experiencing another episode in which he was sleeping excessively, seemed disoriented, and looked unbalanced. Mr. Perry expressed feeling "numb and like his [was] dreaming." Id. at 132. During this exchange, RN Maddox informed Mrs. Perry that Dr. Greenberg recommended that Mr. Perry begin taking modafinil. Id. at 121. A message dated January 17, 2018, indicated that Mr. Perry had been unable to fill the modafinil prescription. Id. at 150. On January 26, 2018, Mrs. Perry again informed RN Maddox of her inability to fill the prescription and of Mr. Perry's continued hypersomnolence. Id. at 141. At a May 4, 2018 neuroimmunology appointment with Dr. Greenberg, modafinil was listed as an outpatient medication, suggesting that Mr. Perry was taking the medication at least by this time. Id. at 176.

[33] *Obstructive sleep apnea* is a disorder characterized by brief, temporary interruptions in breathing resulting from collapse or obstruction of the airway due to the inhibition of muscle tone that occurs during the sleep cycle. Dorland's Illustrated Medical Dictionary 115 (33d ed. 2020).

[34] An *Automatic Positive Airway Pressure* device ("AutoPAP") is used to treat obstructive sleep apnea by drawing in ambient air, pressurizing it to a certain level, and delivering it through a mask to maintain an open upper airway during sleep. Cleveland Clinic, APAP Machine (last accessed August 24, 2026), https://my.clevelandclinic.org/health/treatments/apap-machine.

At that appointment, Dr. Greenberg reported that Mr. Perry was doing well and had experienced no new exacerbations, despite reports that Mr. Perry required additional academic assistance and that his education program was modified to a lower grade level. Id. at 168, 177. Dr. Greenberg did not comment on Mr. Perry's use of modafinil; however, he recorded a strong suspicion of KLS as Mr. Perry's correct diagnosis and stated that CellCept would be discontinued after one year if Mr. Perry's condition remained stable. Id. at 179.

At a May 23, 2019 neuroimmunology appointment, neuropsychological testing continued to show weaknesses in memory and processing speed consistent with prior evaluations. Exhibit 77 at 13. Mr. Perry was reportedly being homeschooled online and preparing to take the GED examination, and Mr. Perry's parents reported that he was functioning well and progressing academically. Id. at 13, 14. Dr. Wang documented a normal neurological examination, noted no mood concerns, and summarized that Mr. Perry was "doing well." Id. at 14, 16. Mr. Perry's medication list reflected continued use of CellCept and modafinil. Id. at 15.

At the trial on December 12, 2022, Mrs. Tammie Perry testified that she "gradually started seeing improvement" in Mr. Perry with the use of CellCept, which he continued taking until being "weaned off" in 2020. Tr. at 20:4-20. Mrs. Perry described her son, who was approximately 21 years old at the time of her testimony: "[Mr. Perry] doesn't seem to be comfortable in big surroundings… we call it social anxiety. He has a lot of… short-term memory issues… [b]ut he is more productive." Id. at 20:23-21:15. Her testimony indicated ongoing academic difficulties and noted that he had not yet earned his GED credential. Id. at 23:8-25.

In sum, Mr. Perry's hospitalizations primarily involved evaluation and treatment for agitation, altered behavior, and somnolence. His brain MRIs were consistently normal, and his EEGs were largely normal, with three resulting in nonspecific findings—one of which was conducted after his PLEX therapy concluded and while he was taking CellCept. LPs showed elevated CSF protein, but were otherwise unremarkable, with negative cultures and a third negative autoimmune encephalopathy panel.

Even without confirmatory findings, Mr. Perry underwent escalating immunotherapy interventions. Various treating providers documented uncertainty regarding the necessity or effectiveness of these interventions, particularly given that symptomatic improvement at times occurred without intervention or in temporal association along with supportive care or psychotropic medications. Risperidone, olanzapine, lorazepam, and others were frequently observed to reduce agitation and to stabilize mood. Notably, episodes of behavioral distress were often accompanied by preserved orientation and awareness, and Mr. Perry repeatedly returned to baseline between events.

Treating providers continued to consider competing diagnostic frameworks. Although some clinicians maintained concern for seronegative autoimmune encephalitis and proceeded with empiric treatment on that basis, others questioned this diagnosis in light of the largely normal objective testing and clinical course. Given Mr. Perry's episodes of hypersomnolence, KLS was raised. Neurologists, neuroimmunologists, and sleep medicine noted that his presentation satisfied diagnostic criteria for KLS, notwithstanding atypical features such as

elevated CSF protein. The records suggest that after modafinil was initiated, Mr. Perry no longer experienced hypersomnolence. Ultimately, no definitive diagnosis was established.

## II. Procedural History

Having set forth the relevant medical history, the undersigned now turns to the procedural course of this case.

### A. Development before Expert Reports

Mr. Perry alleges that his third HPV vaccination caused him to suffer autoimmune encephalitis. Pet. at § I; Posth'g Br. at 1, 45-47. The petition was initially filed by Mr. Perry's mother, Mrs. Tammie Perry, on his behalf while he was a minor. During the course of this litigation, Mr. Perry reached the age of majority and was substituted as the petitioner in this matter. Order, issued Oct. 15, 2020. His mother also provided affidavits and participated in the hearing. See exhibit 20 (affidavit); exhibit 22 (supplemental affidavit); Transcript at 4-51. Mr. Perry further supported his claim by filing medical records summarized in Section I, supra.

The Secretary reviewed this material and recommended against compensation. Resp't's Rep. at 1, filed Aug. 17, 2028. The Secretary acknowledged that Mr. Perry experienced "encephalopathy/encephalitis"; however, he challenged the claim that the condition was caused-in-fact by Mr. Perry's HPV vaccination. Id. at 13-14.[35] One deficiency in the claim, according to the Secretary, was that Mr. Perry had not presented expert opinion linking the vaccination to the alleged condition. Id. at 14.

The Secretary was not interested in settlement at that stage, so the parties were directed to file expert reports, with Mr. Perry initiating the exchange. Order, issued Aug. 20, 2018. Mr. Perry did not, however, immediately provide expert reporting. He successfully moved for two extensions of time and, in the interim, filed his mother's supplemental affidavit and his sister's vaccine record. Exhibit 22 (supplemental affidavit); exhibit 23.

### B. The Experts' Initial Reports

On January 10, 2019, Mr. Perry filed a lengthy report by Dr. Shafrir. Exhibit 24.[36] Without meaningfully defining autoimmune encephalitis (or encephalopathy generally), Dr. Shafrir opined that Mr. Perry, whom he described as genetically susceptible and immunologically "primed" by the first two doses of the HPV vaccine, developed autoimmune encephalitis following his third HPV vaccination. Id. at 52-53.

---

[35] The Secretary later refined his position regarding diagnosis, stating that "there is a near-complete lack of evidence of encephalitis… whether autoimmune or otherwise" and that "his clinical picture does not fit with encephalopathy." Resp't's Post-Hearing Br. at 36, 37. Rather, according to the Secretary, the record "indicates that [Mr. Perry] very likely suffered from [Klein Levine syndrome]." Id. at 51.

[36] Throughout the litigation, the parties filed medical articles on which their experts relied. The dates of those various submissions are not detailed in this Decision.

Although he offered several theoretical mechanisms by which vaccination could induce autoimmunity, Dr. Shafrir's opinion rested principally on molecular mimicry. Id. at 53 (opining that "[Mr. Perry's] immune system produced, *through a mechanism of molecular mimicry and possibly other mechanisms*…, auto-antibodies and possibly [a] cell-mediated attack against certain brain areas which produced his peculiar syndrome with its peculiar course and combination of symptoms.") (emphasis added). Dr. Shafrir based this conclusion primarily on Mr. Perry's overall clinical course, his response to treatment, and what Dr. Shafrir understood to be the opinions of several treating physicians. Id. at 53. Mr. Perry did not, however, submit a report from an expert in immunology, the field that most directly concerns the immune response to vaccination.

On May 15, 2019, the Secretary filed expert reports from Dr. Wirrell, a pediatric neurologist, and Dr. McGeady, a pediatric immunologist. Exhibits B & D. Together, they disputed Mr. Perry's diagnosis and theory of causation, concluding that the HPV vaccination was not the more likely cause of Mr. Perry's condition. Id.

Dr. Wirrell focused her report on diagnosis and clinical presentation. In her response to Dr. Shafrir's report, she analyzed Mr. Perry's clinical findings, concluding that they largely argue against an autoimmune encephalitis diagnosis. Exhibit B at 23. She emphasized that Mr. Perry did not satisfy established diagnostic criteria for autoimmune encephalitis, pointing in particular to an absence of confirmatory antibody testing. Id. at 17-18. In her view, the relapsing-remitting evolution of Mr. Perry's symptoms and his spontaneous recoveries in the absence of immunotherapies were incompatible with the expected progression of autoimmune encephalitis. Id. at 23. She opined that Mr. Perry's presentation more closely aligned with Kleine-Levin syndrome, although she acknowledged that his elevated CSF protein was not fully explained by that diagnosis. Id.

Dr. McGeady addressed causation and timing. As to the latter, he opined that, when Mr. Perry's onset is considered in light of the known kinetics of the human immune response, it would be unlikely that the HPV vaccine caused the alleged condition. Exhibit D at 7-8. Dr. McGeady explained that, if Mr. Perry's immune system had been *primed* by prior doses of the vaccine, a more rapid onset would be expected following a third exposure, rather than the approximately one-month interval that was observed here. Id. at 5-6.

On causation, Dr. McGeady concluded that the evidence did not support a vaccine-mediated cause. Id. at 4. Although he used the term "autoimmune encephalopathy" without clearly distinguishing it from *autoimmune encephalitis*, Dr. McGeady consistently maintained that the evidence favored a viral etiology rather than a vaccine-triggered process. Id. at 4. He also rejected molecular mimicry as the operative mechanism here, along with any suggestion that Mr. Perry was genetically predisposed to mount an autoimmune response through that mechanism in response to his third HPV vaccination. Id. at 6.

Both of the Secretary's experts drew attention to the fact that the medical literature referenced by Dr. Shafrir (nearly 50 items of medical literature were filed along with his first report) consisted of many case reports and theoretical papers exploring vaccine-autoimmunity

hypotheses.[37] These items of medical literature, without more, do not amount to affirmative proof establishing causality. Dr. Wirrell expanded on this critique, noting that the few larger population-based studies have generally failed to demonstrate an increased risk of autoimmune encephalitis or KLS following HPV vaccination.[38] Exhibit B at 21.

1. Diagnosis

The lack of a firm diagnostic consensus among Mr. Perry's treating clinicians is mirrored in the experts' initial reports, which do not converge on a single diagnosis. Notably, even the Secretary's experts were not entirely aligned in their assessments. While Dr. Wirrell adhered to a rigorous clinical definition of encephalopathy and concluded that Mr. Perry was not clinically encephalopathic,[39] Dr. McGeady stated that "there seems to be little question" that Mr. Perry experienced an encephalopathy. Exhibit B at 17; Exhibit D at 3. This internal inconsistency does not materially weaken the Secretary's diagnostic position; Dr. McGeady, an immunologist, expressly deferred to his counterpart, Dr. Wirrell, a neurologist, on diagnostic matters and used the term "encephalopathy" in a general sense to indicate that "something was wrong with [Mr. Perry's] central nervous system." Tr. 403:10-18; exhibit G at 1 n.1.

*Autoimmune Encephalitis*

---

[37] E.g., exhibit 29 (Hamed Amirifard et al., An Unusual Occurrence of Kleine-Levin Syndrome in a Man with Refractory Immune Thrombocytopenic Purpura: A Case Report, 9 J. Med. Case Rs. (2015)) (a case report); exhibit 69 (Teodora Cartisano & Jennifer Kicker, Anti-N-methyl-D-Aspartate Receptor Encephalitis in 7-Month Old Infant Following Influenza Vaccination, 86 Neurology P5.136 (2016)) (a case report); exhibit 37 (Darja Kanduc & Yehuda Shoenfeld, From HBV to HPV: Designing Vaccines for Extensive and Intensive Vaccination Campaigns Worldwide, Autoimmunity Review 1 (2016)) (theoretical paper); exhibit 38 (Nancy Agmon-Levin et al., Vaccines and Autoimmunity, 5 Nat. Rev. Rheumatology 648 (2009)) (theoretical paper and narrative review).

[38] Exhibit B, tab 6 (Lisen Arnheim-Dahlström et al., Autoimmune, neurological and venous thromboembolic adverse events after immunization of adolescent girls with quadrivalent HPV vaccine in Denmark and Sweden: cohort study, 347 British Medical J. 1 (2013)) (a large cohort study finding no evidence supporting associations between HPV vaccination and autoimmune or neurologic adverse events); exhibit B, tab 17 (Anders Hviid et al., Human Papillomavirus Vaccination of Adult Women and Risk of Autoimmune and Neurological Disease, 283 J. Internal Medicine 154 (2018)) (a large cohort study finding an increased risk associated with only one autoimmune disorder (celiac disease) after HPV vaccination); exhibit B, tab 20 (Sara Miranda et al., Human Papillomavirus Vaccination and Risk of Autoimmune Diseases: A Large, Cohort Study of Over 2 Million Young Girls in France, 35 Vaccine 4761 (2017)) (a large cohort study finding that the incidence of autoimmune disease was not increased after exposure to HPV vaccination, except for Guillain-Barré syndrome); exhibit B, tab 8 (Chun Chao et al., Surveillance of Autoimmune Conditions Following Routine Use of Quadrivalent HPV Vaccine., 271 J. Internal Medicine 193 (2012)) (an observational safety study finding no increased risk of autoimmune disorders among women vaccinated with HPV4); exhibit B, tab 15 (Olof Gronlund et al., Incidence of New-Onset Autoimmune Disease in Girls and Women with Pre-Existing Autoimmune Disease After Quadrivalent Human Papillomavirus Vaccination: A Cohort Study, 280 J. Internal Medicine 618 (2016)) (a large cohort study finding no increased risk of new-onset autoimmune disease in girls and women with pre-existing autoimmune disease).

[39] During the entitlement hearing, Dr. Wirrell relied on her initial report and testified that *encephalopathy* refers to a state of "global impairment of cognition" that is associated with abnormalities in arousal, attention, orientation, memory, language, or perception and that generally persists—without waxing and waning "over the very, very short term"—until the underlying cause resolves. Tr at 171:20-172:24.

While the record reflects that Mr. Perry's condition was not straightforward to diagnose or to treat, and his providers worked from a broad differential diagnosis, Dr. Shafrir emphasized the fact that Mr. Perry's providers appeared to coalesce around autoimmune encephalitis as early as July 3, 2015,[40] approximately five weeks post vaccination. Exhibit 24 at 15. Dr. Shafrir stated, however, that this diagnosis was later questioned, in part because Mr. Perry's sister experienced similar, though less severe, symptoms,[41] which raised concern about a potential environmental exposure. Id. at 17. Dr. Shafrir also acknowledged that, given Mr. Perry's emotional lability and fluctuating health status, providers at times entertained alternative diagnoses, including psychiatric conditions. E.g., Id. at 8, 10, 19, & 24.

As the expert reports indicate, the treating physicians' consideration of multiple potential diagnoses appears to have stemmed from several confounding features: the absence of identifiable autoantibodies, Mr. Perry's largely normal EEGs, and his persistently elevated CSF protein without pleocytosis. Dr. Shafrir maintained, however, that these findings did not preclude autoimmune encephalitis as the correct diagnosis. In support, he pointed to Mr. Perry's treating provider's decision to start an empiric trial of steroids, as well as some members of the care team advancing this diagnosis again approximately one year later in August 2016. See id. at 30, 48.

By contrast, Dr. Wirrell rejected autoimmune encephalitis as the correct diagnosis, relying principally on the following diagnostic framework set forth by Graus et al.,[42] an international consensus paper that developed clinical criteria to facilitate the diagnosis of autoimmune encephalitis. Exhibit B at 17-18. According to Graus et al., "possible" autoimmune encephalitis can be diagnosed when all three of the following criteria are met:

1. Subacute onset (rapid progression of less than 3 months) of working memory deficits (short-term memory loss), altered mental status, or psychiatric symptoms,
2. At least one of the following:
    a. New focal CNS findings
    b. Seizures not explained by a previously known seizure disorder
    c. CSF pleocytosis (white blood cell count of more than five cells per $mm^3$)
    d. MRI features suggestive of encephalitis, and
3. Reasonable exclusion of alternative causes.

[40] The neurologist Dr. Dowling recommended proceeding with plasmapheresis ("PLEX") despite Mr. Perry's negative antibody testing and the treatment being generally intended to remove pathogenic antibodies. Exhibit 3-1 at 120.

[41] Mr. Perry's sister also received her third HPV vaccine on May 28, 2015. Exhibit 23; see also, Exhibit 22 (supplemental affidavit) at ¶¶ 1, 2. Per Mrs. Tammie Perry, her daughter "experienced similar symptoms to [her son]… though [] much less severe." Exhibit 22 (supplemental affidavit) at ¶ 3. She testified that her daughter was hospitalized for one night, underwent testing, which was unremarkable, received fluids, and was discharged without a "firm diagnosis" the following day as "she did resolve to baseline." Id.; Tr. at 22:15-21. Mrs. Perry also clarified that some of the contemporaneous medical records erroneously indicated that Mr. Perry's father and other sister also experienced similar symptoms around the same time. Tr. at 46:10-13, 53:7-14; Exhibit 22 (supplemental affidavit) at ¶¶ 4, 5.

[42] Exhibit B, tab 12 (Graus, et al.) at 3.

Id. Applying those criteria to Mr. Perry's presentation, Dr. Wirrell concluded that Mr. Perry did not satisfy the requirements for a diagnosis of autoimmune encephalitis. Id. at 18.

She further emphasized that Mr. Perry lacked the hallmarks typically associated with that condition: in his case, no neuronal antibodies were ever identified; no evidence of intrathecal IgG production was found; no sustained encephalopathic findings on examination were documented; and EEG studies did not reveal the diffuse slowing commonly associated with encephalitis. Id. at 17-18, 23. She opined that Mr. Perry's episodic course was inconsistent with what she would expect in autoimmune encephalitis. In her view, Mr. Perry's brief episodes of agitation and hypersomnolence, followed by relatively rapid recovery, were "very atypical" for autoimmune encephalitis. Id. at 18. She emphasized that several recurrences were resolved within days without immune suppression or immunomodulatory treatment, whereas autoimmune encephalitis typically persists and progresses until such therapy is administered. Id. Dr. Wirrell also noted that Mr. Perry appeared to relapse again in March 2018 despite being treated with CellCept. Id.

*Kleine-Levin Syndrome*

In place of autoimmune encephalitis, Dr. Wirrell endorsed a diagnosis of KLS. She opined that Mr. Perry's somnolence, behavioral disturbance, and pattern of recurrences more closely aligned with KLS; she also suggested that Mr. Perry's moderate obstructive sleep apnea may account for his deficits in attention, memory, executive function, psychomotor function, and language abilities. Id. at 20. Dr. Wirrell acknowledged, however, that neither KLS nor sleep apnea would have readily accounted for Mr. Perry's persistently elevated CSF protein. Id. at 22.

For his part, Dr. Shafrir acknowledged that treating physicians had also raised KLS as a possible alternative diagnosis, and he agreed that aspects of Mr. Perry's later clinical course resembled KLS. Exhibit 24 at 42, 43, 49. He nevertheless raised several doubts as to whether classic KLS was an appropriate fit for Mr. Perry's course. Id. at 49.

First, he viewed Mr. Perry's elevated CSF protein as atypical of KLS. In support, he cited a review of 186 KLS cases reporting no such finding among the cohort,[43] although approximately two-thirds of the patients (116 of 186) did not undergo lumbar puncture to allow for analysis of CSF protein levels. Id. at 49. Dr. Shafrir also cited two items of literature—the Arnulf study and the AlShareef review—[44] that do not identify elevated CSF protein as a feature of KLS; notably, neither do they list it as disqualifying a diagnosis of KLS. Second, Dr. Shafrir questioned whether Mr. Perry ever "truly" returned to baseline functioning between episodes, which would be inconsistent with a typical KLS course. Id. at 29. Third, Dr. Shafrir considered the continuation of immunomodulatory treatment as support for autoimmune encephalitis, reasoning that it reflected the treating physicians' apparent commitment to that diagnosis. Id. at 49.

---

[43] Exhibit 27 (Isabelle Arnulf et al., Kleine–Levin Syndrome: A Systematic Review of 186 Cases in the Literature, 128 Brain 2763 (2005)) at 3, 7.

[44] Exhibit 27 (Arnulf); exhibit 26 (Saad M. AlShareef et al., Kleine-Levin Syndrome: Clues to Aetiology, 22 Sleep & Breathing 613 (2018)).

2. Causation

Though he listed other autoimmune mechanisms in his initial report, Dr. Shafrir advanced a causation theory primarily grounded in molecular mimicry. Exhibit 24 at 53. He laid the groundwork for this theory by observing that multiple peptide homologies exist between HPV vaccine proteins and human proteins and that "[m]any of those proteins have high expression in the brain." Id. at 50. He opined that these shared sequences create the potential for molecular mimicry,[45] whereby vaccine-induced immune responses could cross-react with human tissues and, if directed against the brain, produce symptoms similar to those of Mr. Perry.[46] Id. at 49-50, 53.

The Secretary, through expert testimony, did not dispute the existence of such homologies, challenging instead their significance. Dr. McGeady cautioned that linear sequence similarities do not necessarily translate into pathogenic immune responses, particularly because proteins fold into complex three-dimensional structures that may alter their relevant epitopes, thereby preventing immune recognition of the shared sequence. Exhibit D at 7. He further noted that even the researcher cited twice by Dr. Shafrir (exhibits 36 & 37) has acknowledged that homologies, while intriguing, do not constitute proof of causation and has accordingly characterized the theory of molecular mimicry far more cautiously than Dr. Shafrir.[47] Id.

Dr. McGeady likewise described molecular mimicry as a largely theoretical construct, absent direct evidence linking the subject vaccine antigen to the relevant neurologic target at

[45] Exhibit 36 (Darja Kanduc, Quantifying the Possible Cross-Reactivity Risk of an HPV16 Vaccine, 8 J. Experimental Therapeutics & Oncol. 65 (2009)) at 1 (stating that the "number of viral matches and their locations make the occurrence of side autoimmune cross-reactions in the human host following HPV16-based vaccination almost unavoidable"); exhibit 37 (Darja Kanduc & Yehuda Shoenfeld, From HBV to HPV: Designing Vaccines for Extensive and Intensive Vaccination Campaigns Worldwide, Autoimmun. Rev. 1 (2016)) at 6 (finding that "[c]rossreactions between vaccine antigens and human proteins may be at the root of the harmful autoimmune reactions").

[46] E.g., exhibit 39 (Srdja Janković, Vaccination and Autoimmune Phenomena, 13 Central Eur J Paed 12 (2017)) at 1 (noting that "the potential of vaccines to trigger autoimmunity is largely the consequence of the fact that vaccines, in order to be effective, must elicit some (although preferably subclinical) degree of inflammatory reaction," and that one of the potential mechanisms of initiating an autoimmune response by vaccination at the level of adaptive immunity is *molecular mimicry*). Although the theoretical possibility of such a response cannot be excluded, Janković finds that clearly established examples are "rare rather than common." Id. at 2.

[47] The referenced article explains that *molecular mimicry* originated as an immunologic concept describing how microorganisms evade immune detection by expressing antigens that resemble host tissues. Exhibit D, tab 12 (Darja Kanduc, Peptide Cross-Reactivity: The Original Sin of Vaccines, 13 Frontiers Bioscience-Scholar. 1393 (2012)) at 3. Although the concept later evolved into the hypothesis that infections—and, by extension, vaccines—might trigger autoimmune disease through cross-reactive immune responses, the author concludes that sequence or structural similarity alone does not establish a causal relationship between microbial antigens and human autoimmunity. Id. at 3, 6 (concluding that "[n]o proof of a direct relationship between vaccination and adverse events has been brought to the attention of the scientific and medical communities"). Instead, the author appears to argue that molecular mimicry more likely facilitates immune evasion, rather than initiating autoimmune disease. Id. at 3 (noting that the "molecular mimicry hypothesis *cannot explain autoimmune disease* since, if there were a link between sharing of viral/bacterial peptides and human autoimmune reactions, then the massive extent of viral/bacterial peptide overlap in the human proteome would cause the worldwide human population to suffer from autoimmunity with a 100% incidence.") (emphasis added).

issue here. Id. at 6-7. He contended that while the theory is frequently invoked, it has rarely been persuasively applied to explain disease onset outside of a limited set of examples (which do not involve the HPV vaccine or autoimmune encephalitis).[48] Id. Consistent with this view, Dr. McGeady pointed to the conclusions of the Institute of Medicine that molecular mimicry had not been confirmed as a mechanism for vaccine-related adverse events.[49] Id.

Dr. Shafrir, however, framed this proposed mechanism as not merely theoretical, but a likely outcome, owing to the HPV vaccine's unusually robust immunogenicity. Exhibit 24 at 50. He reasoned that because the HPV vaccine is designed to target a localized, non-invasive infection, the HPV vaccine is "unique" and "highly immunogenic" so that HPV vaccination carries a particularly heightened risk of triggering an autoimmune response.[50] Id. at 49. In support, Dr. Shafrir cited various items of medical literature exploring whether vaccines cause adverse reactions and pointed to reports of autoimmune issues occurring after vaccinations, demonstrating that the scientific and medical communities have suspected that a causal relationship may possibly exist.[51] Id. at 49-52. Of these cases, however, he identified only a single reported instance of "probable autoimmune encephalopathy" occurring after recent HPV vaccination.[52] Id. at 50.

---

[48] See exhibit D, tab 13 (Noel R. Rose, Learning from Myocarditis; Mimicry, Chaos and Black Holes, 6 F1000 Prime 1 (2014)) at 4, 5 (finding that "there is still no evidence…that the antigenic mimic is capable of inducing an autoimmune disease.").

[49] Exhibit D, tab 9 (Kathleen Stratton et al. (Institute of Medicine), Adverse Effects of Vaccines: Evidence and Causality 70 (2012)) at 4.

[50] Exhibits 32 (Margaret Stanley, HPV-Immune Response to Infection and Vaccination, 5 Infectious Agents & Cancer, 1 (2010)) at 4 (noting the highly immunogenic nature of the vaccine); exhibit 33 (Luciano Mariani & Aldo Venuti, HPV Vaccine: An Overview of Immune Response, Clinical Protection, and New Approaches for the Future, 8 J. Translational Med. 1 (2010)) at 3 (noting the highly immunogenic nature of the vaccine).

[51] E.g., exhibit 44 (Centers for Disease Control and Prevention, Recommendations on the Use of Quadrivalent Human Papillomavirus Vaccine in Males--Advisory Committee on Immunization Practices (ACIP), 2011, 60 Morbidity Mortality Weekly R. 1705 (2011)) at 2 (while not commenting on specifically autoimmune encephalitis, the Advisory Committee on Immunization Practices noted that "[p]ostlicensure safety data… including data from >600,000 HPV4 doses administered, showed no statistically significant increased risk for the outcomes studied, including Guillain-Barré syndrome, stroke, venous thromboembolism, appendicitis, seizures, syncope, allergic reactions, and anaphylaxis"); exhibit 45 (Dimitrios Karussis & Panayiota Petrou, The Spectrum of Post-Vaccination Inflammatory CNS Demyelinating Syndromes, 13 Autoimmunity Reviews 215 (2014)) at 7 (observing that the "most common vaccines that are reportedly associated with CNS *demyelinating* diseases in the literature are influenza vaccines (by far the highest number of reported cases) and [HPV] vaccination") (emphasis added).

[52] Exhibit 43 (Yael Hacohen et al., Paediatric Autoimmune Encephalopathies: Clinical Features, Laboratory Investigations and Outcomes in Patients with or without Antibodies to Known Central Nervous System Autoantigens, 84 J. Neurol. Neurosurg. Psychiatry 748 (2013)) at 3 (without alleging a causal connection, analysis of the presentations of 111 patients—48 of whom were considered to have a diagnosis of probably autoimmune encephalopathy—only one patient was found to have had a recent HPV vaccination prior to onset of symptoms).

3. Logical Sequence

Dr. Shafrir suggested that Mr. Perry's prior HPV doses "primed" his immune system, thereby setting the stage for a more pronounced immune response after the third dose. Exhibit 24 at 52. Dr. Shafrir linked that theory to literature indicating that antibody responses tend to peak after completion of the vaccine series.[53] Id. at 52-53. Dr. Shafrir also maintained that Mr. Perry's autoimmune process persisted throughout the documented period, pointing to his ongoing "personality change," "cognitive dysfunction," and what Dr. Shafrir understood to be "persistent elevation of CSF protein." Id. at 53. In Dr. Shafrir's view, this continuous autoimmune process was marked by periods of exacerbation, although Dr. Shafrir acknowledged that the causes of those exacerbations "remain unknown." Id.

Dr. McGeady challenged Dr. Shafrir's theory that reaching post-vaccination "peak antibody levels" was a logical cause of the alleged injury. Exhibit D at 5. He explained that the immune system response would already have been substantially activated before antibody levels reached their peak approximately one month after the third dose. Id. at 5-6. In his view, it was "counterintuitive" that Mr. Perry would remain asymptomatic during that month-long interval—during which time Mr. Perry was allegedly producing and accumulating pathological autoantibodies—rather than experience progressively worsening symptoms. Id. Raising an alternative theory regarding the causal chain, Dr. McGeady opined that an asymptomatic incubation period followed by an abrupt onset of symptoms is an expected feature of many infectious illnesses. Id. at 6.

Dr. Shafrir opined that genetic susceptibility may have contributed to Mr. Perry's condition, noting that "[g]enetic factors were implicated in the pathogenesis of autoimmune diseases"[54] and that "vaccine reactions are also genetically controlled."[55] Exhibit 24 at 52. Because both Mr. Perry and his sister experienced similar symptoms following their third HPV vaccinations, Dr. Shafrir posited that a "probably genetically determined propensity for neurological reaction to the [HPV vaccine]" may have played a role in their presentations. Id. He appeared to imply that the differences in their clinical courses could be attributed to unspecified genetic variation, though this explanation was not further developed. Id.

[53] Exhibit 73 (Clayton D. Harro et al., Safety and Immunogenicity Trial in Adult Volunteers of a Human Papillomavirus 16 L1 Virus-Like Particle Vaccine, 93 J. Nat'l Cancer Inst. 284 (2001)) at 7 (finding that the "third immunization induced a further elevation in end point serum antibody titers in most instances").

[54] Exhibit 70 (Fulvia Ceccarelli et al., Genetic Factors of Autoimmune Diseases 2017, 2017 J. Immunol. Research 1 (2017)).

[55] Exhibit 71 (Jennifer A. Whitaker et al., Adversomics: A New Paradigm for Vaccine Safety and Design, 14 Expert Review Vaccines 1 (2015)) at 2-3 ("Vaccine immunogenicity is influenced by multiple individual patient factors (e.g., age, sex, comorbidities, genetics) and vaccine factors (e.g., antigen dose, vaccine delivery mechanism, vaccine schedule, and vaccine adjuvant)."); exhibit 72 (John Castiblanco & Juan-Manuel Anaya, Genetics and Vaccinology, in Vaccines and Autoimmunity (Yehuda Shoenfeld et al. eds. 2015)) at 5 (noting that vaccine efficacy can be impacted by a number of host factors, including genetics).

Dr. McGeady acknowledged that familial clustering of autoimmune disease can occur. Exhibit D at 4. He nevertheless found it unlikely that the siblings' similar presentations were reflective of an inherited abnormal response to vaccination, especially given their history of prior vaccination without reported incident. Id. Instead, relying on general principles that infections commonly spread throughout households and produce overlapping yet differing clinical manifestations among its members, Dr. McGeady stated that the coincidental presentations are better explained with an infectious etiology. Id. (stating that "the occurrence of a comparable clinical syndrome… in a very similar time frame following immunization is highly unlikely," whereas an infectious process affecting multiple family members "is a common event"). He concluded that, based on the record, an infections trigger was more likely the cause of the siblings' overlapping symptoms. Id.

Like Dr. McGeady, Dr. Wirrell identified Mr. Perry's June 25, 2015 febrile illness as the more likely precipitating event. Exhibit B at 19, 20. Dr. Wirrell, however, acknowledged that Mr. Perry underwent "extensive investigations for underlying infectious etiologies during his first admission" that did not reveal a clear cause of his symptoms. Id. at 16. Dr. McGeady, in turn, emphasized that the clinical features of that illness, including fever, myalgias, and laboratory abnormalities such as elevated liver enzymes, were consistent with a viral process capable of triggering encephalopathy. Exhibit D at 4. Thus, while Mr. Perry's symptoms followed his third HPV vaccination, Drs. Wirrell and McGeady concluded that the sequence was merely coincidental and that the intervening illness provided the more persuasive explanation for the cause of Mr. Perry's neurologic symptoms.

4. Timing

The experts also disagreed about whether Mr. Perry's onset occurred within a medically acceptable timeframe. Dr. Shafrir considered the approximately four-week interval between Mr. Perry's third HPV vaccination and the onset of symptoms to be biologically plausible, relying in part on literature employing a four- to 42-day window as a parameter for its investigation of potentially vaccine-related neurological events.[56] Exhibit 24 at 53. Dr. McGeady disagreed with this approach, noting that the cited timeframe originated in literature[57] investigating reports of Guillain-Barré syndrome following swine influenza vaccination and was not derived from data concerning autoimmune encephalitis following HPV vaccination. Exhibit D at 6. In Dr. McGeady's view, the proposed window therefore lacked a direct evidentiary basis for the particular injury alleged here.

[56] Exhibit 31 (Barbara A. Slade et al., Postlicensure Safety Surveillance for Quadrivalent Human Papillomavirus Recombinant Vaccine, 302 JAMA 750 (2009)) at 5 (analyzing approximately 12,400 Vaccine Adverse Event Reporting System ("VAERS") reports and identifying eight instances of Guillain Barré syndrome occurring within four- to 42-days of HPV vaccination; only one instance of transverse myelitis; and no instances of autoimmune encephalitis or KLS).

[57] See exhibit 31 (Slade) at 5, 8 (citing to "Schonberger LB, Bregman DJ, Sullivan-Bolyai JZ, et al. Guillain-Barré syndrome following vaccination in the National Influenza Immunization Program, United States, 1976-1977. *Am J Epidemiol*. 1979; 110(2):105-123," an item of medical literature that was not filed as an exhibit in this matter).

Dr. Shafrir also relied on literature reporting that antibody titers peak approximately one month after completion of the HPV vaccine series (among patients who completed it in approximately four months).[58] Exhibit 24 at 49, 52-53. He reasoned that Mr. Perry's prior vaccine doses, which he received in 2013 and 2014, primed his immune system, presumably allowing him to tolerate the first two HPV vaccine doses to then experience a pathogenic response approximately one month after the third vaccination in 2015. Id. at 3, 53.

Dr. McGeady offered a different view of the appropriate temporal interval based on established immune kinetics and the understood pathophysiology of autoimmune encephalitis. He explained that a third exposure to an antigen would ordinarily trigger an accelerated memory response, with immune activation expected within days rather than weeks.[59] Exhibit D at 5-6. Thus, in his view, Mr. Perry's lack of reported symptoms at his cardiology visit approximately 27 days post vaccination was difficult to reconcile with a vaccine-induced immune process allegedly building toward severe neurologic symptoms only days later.[60] Id. at 4-5.

That general timing concern was reinforced, Dr. McGeady explained, by the specific immune mechanisms implicated in autoimmune encephalitis, including cytotoxic T cells and certain IgG antibodies.[61] Id. at 6. Dr. McGeady opined that these classes of molecules are both thought to be "directly pathogenic" and capable of interfering with neurologic function or causing tissue injury. Id. For that reason, he opined that if the third HPV dose had triggered autoimmune encephalitis, symptoms would be expected to appear after prompt immune activation, within approximately seven to ten days, rather than after a month-long, symptom-free interval. Id. This criticism not only calls into question Mr. Perry's proposed onset theory but also is consistent with the Secretary's argument that Mr. Perry's intervening febrile illness was a plausible temporal antecedent to the onset of his encephalopathic symptoms. Id.

### C. The First Rule 5 Status Conference

At the subsequent Rule 5 status conference, held on June 19, 2019, the Special Master observed that the expert reports surfaced a complex diagnostic and causation dispute. Rule 5 Order, issued June 25, 2019, at 2. The Special Master stated that Mr. Perry's treatment history implicated an "autoimmune etiology," but that "there was no clear diagnosis or cause of [Mr. Perry's] condition presented in [his] medical record although autoimmune encephalopathy and

[58] Exhibit 73 (Harro) at 5-7.

[59] Exhibit D, tab 6 (Abul K. Abbas et al., B Cell Activation and Antibody Production, in Cellular and Molecular Immunology (9th ed. 2018)) at 3 (noting that secondary antibody responses to protein antigens develop "more rapidly than does the primary response").

[60] See also exhibit D, tab 5 (Abul K. Abbas et al., Properties and Overview of Immune Responses, in Cellular and Molecular Immunology (9th ed. 2018)) at 3 (noting that "[m]ost IgG antibodies have half-lives in the circulation of approximately 3 weeks, whereas other classes of antibodies have half-lives of just a few days.").

[61] Exhibit D, tab 7 (Lily C. Wong-Kisiel et al., Autoimmune Encephalopathies and Epilepsies in Children and Teenagers, 39 Can. J. Neurol Sci. 134 (2012)) at 1 ("Both cytotoxic T cells and effector IgG antibodies are known to be important in the pathophysiology of neural injury in autoimmune neurological disorders."); see also exhibit D, tab 8 (David S. Younger, Autoimmune Encephalitides, 37 Neurol Sci. 359 (2019)).

Kleine-Levin syndrome have been offered." Id. The Special Master nonetheless opined that "regardless of whether the diagnosis is autoimmune encephalitis or Kleine-Levin syndrome, it is my opinion that petitioner's condition is autoimmune in nature." Id. at 3.

Additionally, the Special Master noted that Mr. Perry had advanced a plausible theory linking the HPV vaccination to his condition within a timeframe of symptom onset that has been recognized in the Vaccine Program. Id. at 4. However, Dr. McGeady raised a competing theory—namely, that an intervening viral illness more likely triggered Mr. Perry's condition—supported in part by concerns regarding the expected timing of an immune-mediated response following the third dose of the HPV vaccine. Id.

The Special Master examined the significance of Mr. Perry's clinical course, including evidence that Mr. Perry appeared well for approximately three weeks following vaccination, that he had been cleared by cardiology to participate in sports at that time, and that, within days of the appointment, developed a high fever, chills, a cough, fatigue, and nausea, followed shortly thereafter by neurologic symptoms requiring emergency care. Id. at 3-4. The Special Master noted that the non-neurologic symptoms could reasonably be interpreted in two ways: either as the early manifestation of a single disease process culminating in Mr. Perry's neurologic presentation, or as evidence of a separate intervening infection. Id.

Given that the parties had advanced competing plausible theories of the case, and because Mr. Perry had filed additional medical records contemporaneously with the Secretary's expert reports (which neither Drs. Wirrell nor McGeady had had the opportunity to review), it was agreed that the record should first be supplemented as needed to bring it up to date, after which the Secretary would submit a supplemental report from Dr. Wirrell. Mr. Perry would then have leave to file a responsive expert report. Id. at 5.

### D. Development of Additional Expert Opinions

After filing additional medical records, Mr. Perry transmitted a demand on August 19, 2019. Pet'r's Status Report, filed Aug. 19, 2019. However, in a status report filed October 4, 2019, the Secretary indicated that he "remain[ed] uninterested in settlement and wish[ed] to continue to litigate the case." Consistent with that position, the Secretary filed a supplemental report from Dr. Wirrell on October 22, 2019. Exhibit E. Mr. Perry presented another report from Dr. Shafrir, and then the Secretary followed with a third report from Dr. Wirrell and a second report from Dr. McGeady. This collection of supplemental reports is summarized by topic: diagnosis, causation, and logical sequence.

#### 1. Diagnosis

*Dr. Wirrell's Second Report*

In her brief supplemental report, Dr. Wirrell reviewed the updated medical records and maintained her prior diagnostic opinion. Exhibit E at 4. She continued to opine that Mr. Perry's clinical presentation was consistent with KLS, emphasizing that the additional records continued a pattern of recurrent hypersomnia despite ongoing immunomodulatory treatment. She further

observed that several episodes appeared to follow intercurrent infections, which she viewed as consistent with a relapsing course more typical of KLS than of autoimmune encephalitis cases. Id.

More generally, Dr. Wirrell raised doubts as to whether Mr. Perry's condition was truly autoimmune in nature, implicating instead both KLS (an idiopathic condition) and obstructive sleep apnea (which is not alleged to have an autoimmune etiology). She observed that Mr. Perry continued to have episodes and exacerbations of symptoms even after taking CellCept, and that only after seemingly initiating modafinil in early 2018, had the reports of hypersomnolence and agitation stopped. Id. at 4. She also cited the views of one of Mr. Perry's treating neuroimmunologists, Dr. Greenberg, who, upon examining Mr. Perry on May 4, 2018, approximately one year after initiating CellCept, wrote: "we strongly suspect Kleine-Levin syndrome and will wean off Cellcept in a year if stable." Id. at 2-3; see also exhibit 76 at 179. In addition, she reiterated her concern that Mr. Perry's undertreated moderate obstructive sleep apnea likely contributed to his cognitive difficulties and daytime functioning. Exhibit E at 1.

*Dr. Shafrir's Second Report*

Mr. Perry responded with a supplemental expert report from Dr. Shafrir. Exhibit 78. Dr. Shafrir interpreted the updated records as supporting his theory regarding Mr. Perry's "unusual autoimmune brain condition" continuing along an "evolving course" and as directly challenging the Secretary's position on diagnosis. Id. at 13. Dr. Shafrir surmised that Mr. Perry had persistent cognitive, behavioral, and personality changes that, while likely multifactorial in nature, were attributable to an underlying autoimmune condition. Id. As a "final diagnosis was not reached" in the case, Dr. Shafrir remained open to the possibility that Mr. Perry suffered from both autoimmune encephalitis and atypical Kleine-Levin syndrome, which Dr. Shafrir noted were "not mutually exclusive" Id. at 19.

In his supplemental report, Dr. Shafrir also criticized Dr. Wirrell for relying on the Graus et al. criteria in her initial report, citing literature questioning their relevance to pediatric populations,[62] and instead advanced a broader definition:

1. Evidence of an altered mental status lasting 24 hours or longer,
2. At least two or more of the following minor criteria:
   a. Fever of 38 °C or higher within the 72 hours before or after presentation,
   b. Generalized or partial seizures that were not fully attributable to a preexisting seizure disorder, a new onset of focal neurologic findings,
   c. CSF pleocytosis (white blood cell count of more than five cells per $mm^3$),
   d. Abnormality of brain parenchyma on neuroimaging,
   e. EEG abnormality that is not ascribable to other causes,

[62] Exhibit 85 (Susanna Esposito et al., An Evolving Redefinition of Autoimmune Encephalitis, 18 Autoimmunity Reviews 155 (2019)) at 6.

3. No alternative cause identified.[63]

Id. at 14. Having had already rejected the Secretary's theory that an infectious process caused Mr. Perry's condition, Dr. Shafrir concluded that Mr. Perry satisfied the third criteria. Dr. Shafrir also opined that Mr. Perry met the first criteria, regardless of whether Mr. Perry may have had a waxing and waning presentation with respect to his neurologic symptoms. He did not specify which of the minor criteria that he believed Mr. Perry's presentation would satisfy.

In further contrast with Dr. Wirrell, Dr. Shafrir also maintained that Mr. Perry had improved with ongoing immunosuppressive therapy, which he viewed as evidence supporting an autoimmune CNS process. Id. at 15. Dr. Shafrir interpreted Dr. Greenberg's decision to treat Mr. Perry with Cytoxan and CellCept, which carry significant risks, as reflective of Dr. Greenberg's firm opinion that Mr. Perry suffered from an autoimmune illness, specifically from autoimmune encephalitis. Id. at 13. These medications, Dr. Shafrir reasoned, would not be prescribed absent substantial clinical justification or without considerable confidence in their efficacy. Id.

*Dr. Wirrell's Third Report*

Dr. Wirrell addressed Dr. Shafrir's points in her third report. Exhibit F. Specifically, she criticized what she viewed as Dr. Shafrir's imprecise merging of KLS into a "symptom of autoimmune encephalitis"; she responded to Dr. Shafrir's criticisms of her diagnostic-criteria source, finding that Mr. Perry did not satisfy the criteria for autoimmune encephalitis under his proffered framework; and she questioned his reliance on Mr. Perry's purported response to immunotherapeutics as support for his diagnosis. Id. at 4.

On the first point, Dr. Wirrell addressed Dr. Sharir's blending of autoimmune encephalitis and KLS by emphasizing that the etiology of KLS remains poorly understood. Id. at 4. Even assuming Mr. Perry's course involved KLS or KLS-like features, she opined that the onset history pointed away from immunization as its trigger. Id. at 5. Dr. Wirrell noted that Mr. Perry developed fever, dizziness, nausea and vomiting, which lasted two days, and then developed a severe headache which lasted one day, and that this preceded his neurologic symptoms. Id. In her view, this sequence was more suggestive of an infectious process rather than a vaccine-mediated autoimmune process. Id.

In response to her use of the Graus et al. criteria, Dr. Wirrell acknowledged that they were developed primarily for adults and were therefore "not perfect," but maintained that they provide useful diagnostic guidance. Id. at 2. She then discussed the Hacohen et al. diagnostic criteria, cited by Dr. Shafrir, under which encephalopathic patients with altered consciousness lasting more than 24 hours and at least two additional findings (such as fever, seizures, CSF pleocytosis, EEG findings indicative of encephalitis, or CT/MRI with abnormalities suggestive of encephalitis) were considered to have probable immune-mediated encephalopathy where

[63] See exhibit 84 (J. Nicholas Branton & Howard P. Goodkin, Antibody-Mediated Autoimmune Encephalitis in Childhood, 60 Pediatric Neurolog 13 (2016)) at 13 (describing *encephalitis* as "a broad term encompassing any inflammatory disease process of the brain that manifests clinically with alterations of consciousness and/or behavioral changes…. [that] may occur… through an autoimmune process triggered by an infection, vaccine, or occult neoplasm."); see also exhibit 43 (Hacohen et al.) at 2.

alternative causes were ruled out.[64] Id. Setting aside the fact that she endorsed an alternative explanation, Dr. Wirrell opined that Mr. Perry did not satisfy those additional criteria. She noted that although he had reportedly experienced fever post vaccination, the fever resolved prior to the onset of neurologic symptoms. Id. She also noted that he had no seizures, CSF pleocytosis, or abnormal imaging. Id. Finally, Dr. Wirrell addressed Mr. Perry's abnormal EEG findings, which showed focal slowing. Id. She explained that encephalitis with altered awareness more typically produces diffuse background slowing, whereas Mr. Perry's occipital dominant activity was within normal limits; therefore, Dr. Wirrell indicated that Mr. Perry's abnormal EEGs were more likely than not ascribable to other causes. Id.

Dr. Wirrell also included a table of her chart-review notes, copied below with alterations made by the undersigned, addressing whether Mr. Perry demonstrated a prompt and sustained responsiveness to immunotherapeutics:

| | | |
|---|---|---|
| June 29-July 4, 2015 | No immunotherapy | Improved spontaneously back to normal |
| July 19-28, 2015 | No immunotherapy | Improved spontaneously back to normal |
| August 12-24, 2015 | Solumedrol – Aug 19-14 | Improving by Aug 19, before this treatment was started, back to normal by Aug 24 |
| July 3-11, 2016 | Solumedrol– July 7-10 | Neurology felt patient improved by July 6-7 – family wanted steroid, but neurology did not feel strongly about need for that |
| August 11-21, 2016 | IVIG Aug 16-21 | Improved but ongoing behavior and cognitive issues in the fall per parent report |
| December 16, 2016 | Cytoxan | |
| December 19, 2016 | No immunotherapy | Mr. Perry again agitated |
| February 6-7, 2017 | No immunotherapy | Improved spontaneously |
| March 7-13, 2017 | Cytoxan | |
| March 31-April 4, 2017 | No further immunotherapy | Mr. Perry again agitated; Improved spontaneously |
| April 29-May 3, 2017 | No further immunotherapy | Mr. Perry again agitated; Improved spontaneously |
| May 4-13, 2017 | PLEX x 5 rounds, then started CellCept as maintenance immunotherapy | |
| Mid October 2017 | Continued CellCept; No additional immunotherapy | |

[64] Exhibit 43 (Hacohen et al.) at 2.

| | | |
|---|---|---|
| November 17-27, 2017 | Continued CellCept; No additional immunotherapy | Mr. Perry again agitated |
| Dec 28, 2017-Jan 9, 2018 | Continued CellCept; No additional immunotherapy | Mr. Perry again agitated |
| May 4, 2018 | Continued CellCept with no additional immunotherapy; appears to have initiated modafinil | Improved |

See id. at 3-4.

Dr. Wirrell opined that her table shows that Mr. Perry's course did not consistently improve following either immune suppression or immune modulation. She described her table as reflecting that in some instances, Mr. Perry appeared to have recovered without the use of immunotherapeutics, and in at least one instance, Mr. Perry appeared to have become agitated approximately four days after receiving Cytoxan. Id. Her table does not track numerous other interventions used contemporaneously to manage Mr. Perry's symptoms, including redirection or psychotropic medications.

Dr. Wirrell concluded her third report by reiterating that KLS remained, in her view, the more appropriate diagnosis. Id. at 5. She noted that the condition often involves years of relapsing and remitting symptoms, with persistent cognitive impairment between episodes, which are features she found consistent with Mr. Perry's course. Id. Dr. Wirrell also noted that in cases with recurrent symptoms, "more permanent cognitive and attention problems can be seen, even between attacks," which she impliedly connected to Mr. Perry's experience.[65] She again highlighted Mr. Perry's apparently undermanaged sleep apnea, as a contributing factor to his cognitive difficulties. Id.

2. Causation

The experts also disputed whether Dr. Shafrir's proposed mechanism and timing supplied a reliable causal chain. Dr. Shafrir maintained that molecular mimicry remained a viable causation theory, acknowledging that linear homology alone would not establish causation but opining that it supported the possibility of cross-reactivity. Exhibit 78 at 18. He also emphasized that the precise mechanisms underlying autoimmune conditions are often not fully understood. Id. at 19.

Dr. McGeady, in turn, reiterated his skepticism regarding molecular mimicry. Exhibit G at 3. He found no direct evidence of the type of cross-reactivity alleged in this case. Id. He stressed that causation must be evaluated in terms of probability rather than possibility, and that

[65] See exhibit B, tab 19 (Mitchell G. Miglis & Christian Guilleminault, Kleine-Levin Syndrome, 16 Current Neurol Neurosci R. 1 (2016)) at 2 (noting that "KLS patients almost always exhibit difficulty with communication, executive functioning, and working memory" and that in patients with more prolonged episodes, "these deficits may persist for years after other symptoms have resolved"); exhibit B, tab 11 (Natan Gadoth & Aria Oksenberg, Kleine-Levin Syndrome: An Update and Mini-Review, 39 Brain & Development 665 (2017)) at 666-68 (reviewing literature reporting cases of KLS patients with persistent cognitive deficits).

in this case, a "previously undescribed adverse reaction to a remotely received vaccine" was considerably improbable. Id.

3. Logical Sequence and Onset

Although Drs. Shafrir and McGeady appeared to agree that Mr. Perry experienced an encephalopathic process at the outset, neither identified a definitive cause. Instead, the experts continued to disagree as to the likely trigger of Mr. Perry's initial presentation. In response to Dr. McGeady's opinion that Mr. Perry's initial presentation was attributable to a viral infection, Dr. Shafrir acknowledged that treating physicians likewise initially considered an infectious etiology, but he emphasized that they later favored an autoimmune explanation. Exhibit 78 at 19. Dr. Shafrir took the evolution as supportive of his opinion.

Both experts relied in part on circumstantial evidence, including Mr. Perry's sister's contemporaneous illness, which each expert interpreted as bolstering his respective theory. Id. at 18; Exhibit G at 2. Dr. McGeady also emphasized that a viral infection is a well-recognized antecedent to KLS, whereas the vaccine-induced mechanism proposed by Dr. Shafrir lacked documented precedent. Exhibit G at 1.[66] Dr. McGeady further reasoned that viral infections commonly spread among household members with differing degrees of severity, making an intercurrent infectious trigger more probable than an inherited or shared abnormal reaction to vaccination. Id. at 3.

Dr. McGeady likewise disputed Dr. Shafrir's peak-antibody theory, reasoning that it assumed without sufficient evidence that a pathogenic immune response would coincide with maximal antibody levels. Id. (stating "Dr. Shafrir cites the finding of maximal levels of antibody 30 days following the third dose of HPV vaccine as evidence that that time is when the maximal immune pathology would be observed. This position suggests that only antibody at its maximal titer is capable of causing pathology."). In his view, Dr. Shafrir improperly extrapolated from the understanding of the kinetics of a normal immune response to that of a pathological one, without establishing that the two processes would necessarily track one another. Id. at 2 (stating "[t]he immune response to antigens is known to be accelerated by repeated exposures thus to propose that the kinetics of an adverse immune reaction to a neoantigen would be the same as that of an antigen being received for the third time, would be unreasonable").

Consistent with his opinion that were Dr. Shafrir's theory correct, Mr. Perry's symptoms would have manifested sooner, Dr. McGeady continued to challenge Dr. Shafrir's reliance on a 3- to 42-day onset window. Exhibit G at 2. He observed that the study upon which Dr. Shafrir relied involved the influenza vaccine and Guillain-Barré syndrome, rather than the HPV vaccine and autoimmune encephalitis and therefore did not persuasively support the proposed temporal relationship in this case. Id.

[66] Dr. McGeady wrote that, as an immunologist, his focus has been on the mechanism of Mr. Perry's illness, deferring to Dr. Wirrell's opinion regarding Mr. Perry's ultimate diagnosis, who noted herself that "a preceding [viral] infection is, by far, the most common antecedent factor" in the development of KLS. See exhibit B at 20.

Dr. Shafrir referenced commentary from the prior Special Master suggesting that the symptoms identified by the Secretary as evidence of a viral illness may instead have reflected a prodromal phase of autoimmune encephalitis. Exhibit 78 at 19.[67] If so, this interpretation would place onset somewhat earlier. Although Dr. Shafrir invoked this possibility, he did not meaningfully develop the point. And although the record reflects that those initial symptoms of myalgia, fever, and chills were reported as having resolved before the onset of neurologic symptoms,[68] Dr. Shafrir opined that "[t]here was no recovery between the initial febrile illness in (sic) his progressive neurologic symptoms." Id. at 19.

### E. Summary of Expert Reports

In July 2020, Drs. McGeady and Wirrell submitted the final written reports from the experts. This process began with Dr. Shafrir's first report, filed in January 2019.

The highlights of the expert reports are presented below:

| Party | Ex. | Author / # | Central Points |
|---|---|---|---|
| P | 24 | Dr. Shafrir Initial Report | Diagnosis = autoimmune encephalitis, where the third HPV vaccination triggered a heightened immune response in a genetically susceptible individual |
| R | B | Dr. Wirrell Initial Report | Diagnosis = Kleine-Levin syndrome, where an intervening infection was likely associated with the condition and where undermanaged moderate obstructive sleep apnea likely contributed to Mr. Perry's presentation |
| R | D | Dr. McGeady Initial Report | Questioned Dr. Sharir's causation theory and the temporal sequence of events, endorsing an alternative trigger (an intervening infectious process) for Mr. Perry's neurologic symptoms |
| R | E | Dr. Wirrell Supplemental Report | Review of updated records, arguing that they support her diagnosis |
| P | 78 | Dr. Shafrir Supplemental Report | Review of updated records and diagnostic framework; reiterated theory of causation and reasonableness of the proposed onset of symptoms |

[67] The Special Master wrote: "It does seem possible that the reported physical symptoms in the days before full onset may have been a prodrome of the condition." Rule 5 Order, filed June 25, 2019, at 4.

[68] Exhibit 2 at 317-18 (Mr. Perry was recorded as normothermic and denying pain; no gastrointestinal or musculoskeletal deficits were noted).

| | | | |
|---|---|---|---|
| R | F | Dr. Wirrell Third Report | Responded to Dr. Shafrir's supplemental report; maintained her diagnostic opinion |
| R | G | Dr. McGeady Supplemental Report | Responded to Dr. Shafrir's supplemental report; maintained his theory of causation based partly on the temporal sequence of events; again endorsed the intercurrent infection as an alternative trigger |

### F. The Second Rule 5 Status Conference

Against this backdrop, a second status conference was held on September 9, 2020, with a Rule 5 Order following on September 14, 2020. Despite extensive expert reporting by this stage in the proceeding, the Special Master noted that the diagnostic uncertainty was ongoing. The Special Master further noted that literature cited by the parties suggested that the etiology of KLS is unknown, but that it may be autoimmune in nature. Id. He also noted the persistently elevated CSF protein levels, as such findings have not been observed in reported cases of KLS and remained unexplained in Mr. Perry's case. Id. at 2.

Turning to potential triggers, the Special Master addressed whether Mr. Perry's initial symptoms, manifesting between his cardiology appointment and his first ED presentation, reflected an intervening infection or the onset of his neurologic condition. Id. He also considered the fact that Mr. Perry's sister, who received her third does of the HPV vaccine on the same day, experienced similar but transient symptoms, concluding that this circumstance "mildly favors vaccine causation." Id.

With respect to timing, the Special Master addressed the Secretary's argument that the approximately monthlong interval between vaccination and onset was inconsistent with the expected timing of an immune response, particularly given that Mr. Perry had received two previous doses. Id. However, the Special Master indicated that onset within a 3- to 42-day timeframe had been accepted in the Program and concluded that timing did not present a significant barrier to Mr. Perry's claim. Id.

The Special Master ultimately characterized the case as "a very close call as to a diagnosis and causation," granting that both parties presented capable experts, that Mr. Perry's clinical presentation was unusual and complex, and that the etiology of the condition remained incompletely understood. Id. He advised the parties to consider litigation risk in evaluating settlement and suggested that Mr. Perry reassess his demand. Id.

### G. Briefing Stage and the Entitlement Hearing

Following the conference, Mr. Perry filed updated medical records on September 30, 2020, and subsequently transmitted a revised settlement demand. The Secretary, however, reiterated his intent to continue litigating the case. Resp't's Status Report, filed Nov. 6, 2020.

The parties were thereafter directed to provide their availability for an entitlement hearing. Scheduling Order, issued June 21, 2021.[69]

Mr. Perry was directed to file a pre-hearing brief and did so by submitting a lengthy summary of the record and his argument in support of entitlement; the Secretary was permitted to do the same but declined to do so. Preh'g Order, issued Oct. 27, 2022; Pet'r's Preh'g Br., filed Nov. 21, 2022.

A remote entitlement hearing was then held on December 12-13, 2022, before the prior Special Master. A court reporter recorded the proceedings, and certified transcripts were filed in the record. At the hearing, both parties presented testimony from their respective experts, who addressed the issues of diagnosis, causation, and the timing of Mr. Perry's symptoms in relation to the subject vaccination. The testimony further developed the distinctions between autoimmune encephalitis, encephalopathy, and KLS, as well as the competing theories regarding whether Mr. Perry's condition was triggered by vaccination or by an intervening infectious process. Additionally, Mrs. Tammie Perry appeared as a fact witness.

1. Testimony of Mrs. Tammie Perry

Mrs. Tammie Perry provided clarification regarding her son's medical records and symptoms. She disputed certain contemporaneous records describing a medical episode involving her daughter (Mr. Perry's sister) asserting that they contained inaccuracies. Tr. at 22:15-21; see also supra note 22.

She further addressed references in the medical records to Mr. Perry's fatigue and sleepiness. While those records, including entries as early as June 30, 2015, reflected reports that Mr. Perry was "sleeping all the time" and experiencing fatigue, she testified that, at least initially, his sleep followed periods of agitation and distress, during which family members would attempt to calm him. Tr. at 34:20-35:6. According to her account, once he settled, he would fall asleep for short periods of time, which she distinguished from periods of hypersomnolence that she observed later in his course. Id. Although the medical records reflect her report of extended sleep as early as July 22, 2015, Mrs. Perry testified that what she considered "excessive sleepiness" had begun only after Cytoxan was initiated in December 2016. Exhibit 3-2 at 757; Tr. 18:9-25, 31:3-10; exhibit 3-8 at 3808 (noting that Mr. Perry received his first dose of Cytoxan in December 2016); but see Tr. at 42:12-43:9 (Mrs. Tammie Perry acknowledging her August 2015 report to her son's care team that "[Mr. Perry] usually begins the episodes with extreme fatigue and lethargy, sleep[ing] for 12-14 hours"; exhibit 3-3 at 1077.

Finally, she offered testimony regarding the course of Mr. Perry's symptoms following his last hospitalization in May 2017. She stated that, after that time, the more severe episodes of agitation and outbursts subsided, although Mr. Perry continued to experience periods of increased sleepiness. Tr. at 40:8-15. She also indicated that, in later years, episodes did not always require hospitalization and that they ultimately ceased, though she described the timing of

[69] During this period, Mr. Perry reached the age of majority and was substituted as the petitioner in this matter. Order, issued Oct. 15, 2020.

cessation in approximate terms, estimating that his last episode occurred around 2018 or 2019. Id. at 40:11-41:11, 44:20-23. She also provided an update on Mr. Perry's condition at the time of her testimony, reporting that while he had had no further episodes, he continued to suffer from residual issues such as short-term memory difficulties, vision concerns, and occasional problems with concentration. Id. at 43:10-17.

2. Testimony of the Expert Witnesses

Mrs. Tammie Perry's testimony was followed by testimony from the parties' expert witnesses. For the most part, the experts' testimony was consistent with the opinions set forth in their written reports. Their live testimony is briefly addressed here, where it clarified or further developed issues raised in their reports.

First, Dr. Wirrell addressed the relationship between various diagnostic frameworks for autoimmune encephalitis that are described in the submitted literature, including Dale et al.,[70] Graus et al.,[71] and Cellucci et al.[72] Dr. Wirrell explained that Dale et al. raised uncertainty as to whether the Graus et al. criteria fully applied to children, and that Cellucci et al. (the most recent of the three publications) was intended to modify existing diagnostic criteria for specifically pediatric patients.[73] Tr. at 214:14-20. She then applied the Cellucci et al. criteria to Mr. Perry's case and opined that Mr. Perry did not satisfy them either. Tr. at 194:23-25.

Dr. Wirrell also clarified her view of what would constitute a meaningful response to immunotherapeutics. She testified that the expected benefit from therapies, such as IVIg, PLEX, and Cytoxan, is often seen within a couple of days following administration with the main benefits becoming more apparent in a couple of weeks. Tr. at 218:11-219:6. She added that the benefits of Cytoxan would ordinarily persist for three to six months. Id. at 219:2-6. In that context, she considered that Mr. Perry's recurrences shortly after receiving immunotherapy were inconsistent with the expected treatment response. Id. at 219. For example, she noted that after Mr. Perry received his first dose of Cytoxan on December 15, 2016, the record indicated that he had another episode beginning on December 19, 2016, and again on February 6, 2017, and that after Mr. Perry received his second Cytoxan infusion on March 7, 2017, he was hospitalized from March 31 to April 4, 2017, for another exacerbation. Id.; see also exhibit 3.8 at 3808, 3811; exhibit 3.9 at 4112-13, 4203-04.

[70] Exhibit 79 (Russell C. Dale et al. Autoimmune Encephalitis in Children: Clinical Phenomenology, Therapeutics, and Emerging Challenges, 30 Current Opinion Neurol 334 (2017)) at 1 (noting the "need for paediatric-specific consensus definitions for seronegative suspected autoimmune encephalitis").

[71] Exhibit B, tab 12 (Graus, et al.) at 3.

[72] Exhibit F, tab 3 (Tania Cellucci et al., Clinical Approach to the Diagnosis of Autoimmune Encephalitis in the Pediatric Patient, 7 Neurol Neuroimmunol Neuroinflamm. (2020)) at 2. Dr. Wirrell noted that Professor Dale was a senior author for both exhibit 79 (Dale) & exhibit F, tab 3 (Cellucci). Tr. at 213:22-214:3.

[73] Exhibit F, tab 3 (Cellucci) at 1 (cautioning that its "proposed criteria and algorithm require validation in prospective pediatric cohorts.").

**H. Post-Hearing Development**

Following the hearing, Mr. Perry and the Secretary filed post-hearing briefs on August 4, 2023, and October 18, 2023, respectively. In his post-hearing brief, Mr. Perry observed that Dr. Shafrir found the "more general term"—*autoimmune central nervous system process*, which Dr. Wirrell used in her initial expert report—as "mutually agreeable" between the parties. Pet'r's Posth'g Br. at 46 (quoting exhibit 78 at 15); see also exhibit B at 12. While Mr. Perry reaffirmed that his claimed injury is autoimmune encephalitis, he questioned whether applying the more general term would obviate the need to determine an exact diagnostic label. Pet'r's Posth'g Br. at 46-47.

The brief summarized the arguments advanced through Dr. Shafrir's expert reports and hearing testimony. Consistent with his principal argument that the evidence supported a diagnosis of autoimmune encephalitis, Mr. Perry asserted that his clinical presentation satisfied the diagnostic criteria[74] set forth following the March 2012 meeting of the International Encephalitis Consortium and substantially satisfied other proposed diagnostic frameworks for autoimmune encephalitis, including the 2020 Autoimmune Encephalitis International Working Group criteria.[75] Pet'r's Posth'g Br. at 48-54, 55-57. Mr. Perry acknowledged that he did not strictly satisfy the proposed criterion requiring CSF inflammatory changes, as his CSF studies repeatedly demonstrated elevated protein albeit without pleocytosis. Id. 55-56. However, relying on Dr. Shafrir's testimony and Cellucci et al., Mr. Perry argued that elevated CSF protein may nevertheless reflect neuroinflammation, that consensus diagnostic criteria are intended as clinical guidelines rather than rigid prerequisites, and, emphasizing Dr. Shafrir's testimony, that patients with autoimmune encephalitis are frequently diagnosed in clinical practice without satisfying every criterion. Id.; see also Tr. at 438:14-440:13. Mr. Perry further argued that the diagnostic evidence was reinforced by treating physicians who considered autoimmune encephalitis in their differential diagnoses, recommended immunotherapeutic treatments, and documented that Mr. Perry responded favorably to those therapies. Pet'r's Posth'g Br. at 59-66.

The brief also addressed the Secretary's contention that Mr. Perry's symptoms were most consistent with KLS. Id. at 66-71. Relying on Dr. Shafrir's testimony, Mr. Perry argued that his initial presentation did not satisfy the full diagnostic criteria for KLS and emphasized that several treating physicians likewise questioned the diagnosis because of his features that were atypical of KLS. Id. at 66. At the same, Mr. Perry acknowledged that his clinical course became increasingly complex and recognized medical literature describing secondary KLS, including a report of one patient developing KLS after autoimmune encephalitis.[76] Id. at 70-71. Ultimately, Mr. Perry maintained that autoimmune encephalitis remained the more appropriate diagnosis because it could account for both his encephalopathic presentation and subsequent hypersomnolence, whereas, in Mr. Perry's view, his clinical and laboratory findings were inconsistent with primary KLS. Id. at 66-71.

---

[74] Exhibit F, tab 1 (Venkatesan) at 2-3.

[75] Exhibit F, tab 3 (Cellucci) at 4.

[76] Exhibit 27 (Isabelle Arnulf et al., Kleine–Levin Syndrome: A Systematic Review of 186 Cases in the Literature, 128 Brain 2763 (2005)) at 9.

The remainder of Mr. Perry's brief focused on causation. Id. at 71-89. Mr. Perry reiterated his theory that the third HPV vaccination triggered an autoimmune process culminating in autoimmune encephalitis and argued that he had established a prima facie case under Althen. Mr. Perry further contended that the Secretary had failed to establish that an unrelated factor caused his condition. Id. at 89-90 (citing Shyface v. Sec'y of Health & Human Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999), and Knudsen v. Sec'y of Health & Human Servs., 35 F.3d 543, 549 (Fed. Cir. 1994)). In particular, Mr. Perry challenged the Secretary's theory that an intervening viral illness explained his symptoms, arguing that the contemporaneous medical records did not support that conclusion and emphasizing Dr. McGeady's testimony that he could not identify any specific viral pathogen. Id. at 90.

The Secretary argued that Mr. Perry failed to establish either diagnosis or vaccine causation by a preponderance of the evidence. Resp't's Posth'g Br. at 35. With respect to diagnosis, the Secretary contended that the evidence more strongly supported KLS than autoimmune encephalitis. Although Mr. Perry argued that KLS itself may have an autoimmune basis, the Secretary characterized that proposition as speculative and insufficiently established. Id. at 59. The Secretary further emphasized testimony that the most effective known treatment for KLS is lithium rather than immunotherapeutics, arguing that this fact weighs against the contention that KLS is fundamentally an immune-mediated disorder. Id. (citing Tr. at 234-35).

The Secretary also rejected Dr. Shafrir's theory that Mr. Perry's condition represented an "evolution" of autoimmune encephalitis into a KLS-like syndrome. According to the Secretary, Dr. Shafrir identified no credible immunological mechanism by which one disease would transform into another. Resp't's Posth'g Br. at 60-61; see also Tr. at 339:2-25 (Dr. Wirrell noting that one neurological presentation may change as part of a longer disease process but that she was unaware of a case of autoimmune encephalitis later becoming KLS). Although the record contains literature[77] describing a single KLS patient with at least one episode of "[e]ncephalitis symptoms" prior to the onset of a symptomatic episode of KLS, the Secretary maintains that coexistence does not demonstrate causation, transformation, or any established relationship between the two disorders. Resp't's Posth'g Br. at 60-61.

Turning to causation, the Secretary argued that the record contains little objective evidence of an autoimmune process and no reliable evidence linking HPV vaccination to either autoimmune encephalitis or KLS. Id. at 62-65. The Secretary observed that many of the articles cited by Dr. Shafrir involved different vaccines, different diseases, isolated case reports, or circumstances materially different from those presented here. Id. By contrast, the Secretary relied on larger epidemiological studies that did not demonstrate a statistically significant association between HPV vaccination and either autoimmune encephalitis or KLS. Id. at 65.

Finally, the Secretary challenged Dr. Shafrir's proposed mechanism of causation. While acknowledging the existence of peptide homologies between HPV vaccine components and human proteins, the Secretary argued that sequence similarities alone do not establish pathologic immune cross-reactivity. Id. at 66-67. Relying on Dr. McGeady's testimony, the Secretary

[77] Exhibit B, tab 16 (Yu-Shu Huang et al., Relationship Between Kleine-Levin Syndrome and Upper Respiratory Infection in Taiwan, 35 Sleep 123 (2011)) at 3.

emphasized that immune recognition depends not only on linear amino acid sequences but also on complex three-dimensional protein structures. Id. (noting that Professor Kanduc, who authored two articles[78] that Dr. Shafrir cited as support for the notion of potentially pathologic homologies existing between the HPV vaccine components and human tissue, also authored an article[79] cautioning against any notion that vaccines can cause autoimmune disease); see also Tr. at 374:2-76:7 (referring to an article,[80] Dr. McGeady noted that protein structures do not exist in nature as linear epitopes; instead, they are "twisted and folded and come in upon themselves," creating various three-dimensional structures, such that the primary sequence homologies are not relevant to this matter).

The Secretary further noted testimony that, although molecular mimicry is a recognized concept in immunology, it has not been demonstrated in connection with HPV vaccination or shown to explain Mr. Perry's condition. Resp't's Posth'g Br. at 66-67; see also Tr. at 368:25-371:13 (citing to an article,[81] Dr. McGeady observed that while a vast number of instances of epitope mimicry between microorganisms and human cellular antigens have been described, in a great majority of them, there is no evidence that an antigenic mimic is capable of inducing an autoimmune disease.)

Mr. Perry was not directed to file a reply and filed none thereafter. See Scheduling Order, issued December 13, 2022; Scheduling Order, issued May 25, 2023. In the absence of a reply, Mr. Perry did not rebut the most recent articulation of the Secretary's arguments.

On February 24, 2026, the case was subsequently reassigned to the undersigned. No additional evidence was submitted, and neither party sought an additional hearing in this matter. See Pet'r's Status Report, filed Mar. 27, 2026, at 2; Resp't's Status Report, filed Apr. 3, 2026, at 1. The case was therefore fully submitted for a ruling on entitlement.

## III. Standards for Adjudication

A petitioner is required to establish his case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The *preponderance of the evidence* standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v.

---

[78] Exhibit 36 (Kanduc, Quantifying the Possible Cross-Reactivity Risk of an HPV16 Vaccine); exhibit 37 (Kanduc & Shoenfeld).

[79] Exhibit D, tab 12 (Kanduc, Peptide Cross-Reactivity: The Original Sin of Vaccines) at 6 (concluding that "[n]o proof of a direct relationship between vaccination and adverse events has been brought to the attention of the scientific and medical communities").

[80] Exhibit D, tab 11 (Gerhild Wildner & Stephen R. Thurau, Database Screening for Molecular Mimicry, 18 Immunology Today, 252 (1997)) at 1 (noting that "while database screening for primary sequence homologies might sometimes give a hint to relationships between epitopes, the important three-dimensional structure... cannot yet be searched for in a database.").

[81] Exhibit D, tab 13 (Noel R. Rose, Learning from Myocarditis: Mimicry, Chaos and Black Holes, 6 F1000 Prime 6 (2014)) at 10.

Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (alteration in original) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Human Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between *preponderant evidence* and *medical certainty* is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Human Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Human Servs., 9 F.3d 958, 961-62 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

The undersigned must consider the record as a whole, including the Secretary's evidence, when evaluating whether a petitioner has satisfied the Althen prongs. See 42 U.S.C. § 300aa–13. Importantly, certain types of evidence, standing alone, are insufficient to satisfy this burden. A mere temporal association between vaccination and injury does not establish causation. Moberly, 592 F.3d at 1323 (quoting Althen, 418 F.3d at 1278, and Grant v. Sec'y of Health & Human Servs., 956 F.2d 1144, 1148 (Fed. Cir. 1992)). Nor does the absence of a known alternative cause relieve a petitioner of his obligation to establish causation by preponderant evidence. Grant, 956 F.2d at 1149.

## IV. Elements of Compensation

The Vaccine Act requires that a petitioner establish five elements. 42 U.S.C. § 300aa–11(c)(1)(A) through (E). Here, the central dispute concerns the third element, causation.[82] 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I). To establish causation, a petitioner may rely upon the Vaccine Injury Table, which establishes a presumption of causation if certain criteria are met. Here, however, Mr. Perry does not allege a Table injury under the Vaccine Act. Joint Preh'g Submission at 1. Thus, he is necessarily pursuing an off-Table claim.

For an off-Table claim to succeed, a petitioner must affirmatively demonstrate that the vaccination at issue actually caused the alleged injury. A petitioner carries this burden by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Human Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005). Only after the petitioner satisfies his burden by preponderant evidence does the burden shift to the Secretary to show that the injury was in fact caused by factors unrelated to the vaccine. LaLonde v. Sec'y of Health & Human Servs., 746 F.3d 1334, 1340 (Fed. Cir. 2014) (citing Althen, 418 F.3d at 1278).

## V. Analysis

Mr. Perry must provide sufficient evidence that it is more likely than not that his May 28, 2015 HPV vaccination caused his alleged injury. While the parties do not meaningfully dispute

[82] A secondary dispute concerns diagnosis. See infra at Section V.B.2.

that Mr. Perry had neurologic symptoms approximately four weeks after the subject vaccination, they sharply disagree regarding the nature of his presentation and its cause. Accordingly, the central disputes in this case concern Mr. Perry's causation theory as well as whether autoimmune encephalitis was the proper diagnosis and whether the evidence established that the vaccination more likely than not caused his condition. Joint Preh'g Submission at 2; see also infra at Section V.B.3 (analysis of Althen prong one) & Section V.B.2 (analysis of diagnosis dispute and Althen prong two).

Before addressing diagnosis and the Althen prongs, the Court first considers the qualifications of the parties' expert witnesses. This step is particularly important here because Mr. Perry's causation theory rests heavily on questions of pediatric neurology and immunology. Accordingly, the relative expertise of the witnesses informs the weight assigned to their opinions throughout the analysis that follows.

The undersigned then turns to causation in fact. The analysis begins with Althen's third prong, on which Mr. Perry presents his strongest argument. In addressing the remaining Althen prongs, the undersigned considers the parties' dispute regarding Mr. Perry's diagnosis and concludes that resolution of that issue is unnecessary to determine entitlement. Even under a framing of the diagnosis dispute that is more favorable to Mr. Perry, the undersigned concludes that Mr. Perry has not met his burden of establishing causation in fact.

### A. Qualifications

Special masters may consider the relative expertise of testifying experts when weighing the value of their opinion. See Snyder v. Sec'y of Health & Human Servs., 553 F. App'x 994, 1000-03 (Fed. Cir. 2014) (special master's finding that respondent's experts were more persuasive due in part to their current practice in neurology compared to petitioner's expert who had no recent practice was not arbitrary or capricious); see also Tompkins v. Sec'y of Health & Human Servs., 117 Fed. Cl. 713, 719 (2014) (noting special master reasonably articulated one expert's relative lack of training and experience as a basis for not crediting the witness); Holmes v. Sec'y of Health & Human Servs., 115 Fed. Cl. 469, 490 (2014) (stating special master was reasonable in considering a testifying expert's research credentials in the field and his expertise in the diagnosis and treatment of disorders in that area); Locane v. Sec'y of Health & Human Servs., 99 Fed. Cl. 715, 726-27 (2011) (finding special master rationally credited an expert with specialization in the disease in determining when the petitioner's disease began), aff'd, 685 F.3d 1375, 1380 (Fed. Cir. 2012); Copenhaver v. Sec'y of Health & Human Servs., 129 Fed. Cl. 176, 183 (2016) (rejecting argument that special master erred in evaluating the qualifications of the experts).

Here, both parties presented well-qualified experts in the field of pediatric neurology. Dr. Shafrir has practiced pediatric neurology for decades and testified that most of his current patients "have some form of autoimmune encephalopathy," reflecting a continuing focus on that area of neurology. Exhibit 25 at 1; Tr. at 61:7-9; accord Walters v. Sec'y of Health & Human Servs., No. 15-1380V, 2023 WL 3750716, at *15 (Fed. Cl. Spec. Mstr. June 1, 2023) (stating Dr. Shafrir's practice involves many patients with neuro-immune disorders). During cross-examination, Dr. Shafrir estimated that he has treated at least ten patients with autoimmune encephalitis over the course of his career and approximately two patients with KLS. Tr. at 62:6-

8, 109:23-110:4. Thus, Dr. Shafrir possesses relevant experience concerning both autoimmune encephalopathies and KLS.

Dr. Wirrell is likewise well-qualified. She has practiced pediatric neurology for approximately 26 years and, as a professor, department chair, and director of Child and Adolescent Neurology at the Mayo Clinic, maintains an active hospital-based practice evaluating approximately 700 to 800 patients each year. Id. at 164:11-24, 166:18-25. Dr. Wirrell estimated that she treats approximately three patients with autoimmune encephalitis annually. Id. at 167:25-168:1. While, when compared to Dr. Shafrir, Dr. Wirrell appears to have an especially active clinical practice in addition to teaching and participating in neurological research and academic scholarship, both parties retained neurologists who possess sufficient expertise to offer opinions on the neurological matters at issue in this case.

Accordingly, both neurologists' opinions warrant careful consideration. The Court therefore evaluates their testimony primarily on the strength of their reasoning and their consistency with the medical record. Ultimately, the persuasiveness of each expert's testimony depends upon the extent to which the expert adequately supports his or her conclusions. See Doyle v. Sec'y of Health & Human Servs., 92 Fed. Cl. 1, 8 (2010) ("Mere conclusory opinions—or ones that are nearly so as unaccompanied by elaboration of critical premises—will not suffice as proof of causation, no matter how vaunted or sincere the offeror"); Moberly, 592 F.3d at 1324 ("the special master is entitled to require some indicia of reliability to support the assertion of the expert witness").

Unlike the parties' neurological experts, however, their experts' respective qualifications in immunology are not closely comparable. Dr. McGeady has been board-certified in immunology since 1975 and has devoted decades of his clinical and academic career to the study of immunologic disorders. Exhibit I at 1. By contrast, Dr. Shafrir acknowledged that he has no specialized training or board certification in immunology. Tr. at 109:17-22. Other opinions have pointed out Dr. Shafrir's relative lack of experience in immunology. E.g., Kinney v. Sec'y of Health & Human Servs., No. 18-1522V, 2024 WL 2831616, at *10 n.5 (Fed. Cl. Spec. Mstr. May 8, 2024) ("Dr. Shafrir confirmed that he had no training in immunology subsequent to medical school"); T.M. v. Sec'y of Health & Human Servs., No. 08-284V, 2016 WL 11087157, at *12 n.20 (Fed. Cl. Spec. Mstr. Aug. 9, 2016) (suggesting that because Dr. Shafrir is not an immunologist, he does not possess "the professional experience" to opine about homology beyond general medical training in molecular biology and personal familiarity with it); Cunningham v. Sec'y of Health & Human Servs., No. 13-483V, 2016 WL 4529530, at *16 (Fed. Cl. Spec. Mstr. Aug. 1, 2016) ("despite advancing a theory steeped in immunology, Dr. Shafrir is not himself an immunologist… [making his] overstatements all the more unpersuasive, because he does not have any established clinical or research background to support statements that are not fully confined to the medical literature he cited"); R.V. v. Sec'y of Health & Human Servs., No. 08-504V, 2016 WL 3882519, at *15 (Fed. Cl. Spec. Mstr. Feb. 19, 2016) ("[Dr. Shafrir] is not an expert in immunology"). While the special masters in these cases considered Dr. Shafrir's opinions on immunological matters, they generally afforded those opinions less weight.

The undersigned follows the same approach here. Dr. Shafrir's immunological opinions remain part of the evidentiary record and have been considered, but they merit less weight than the immunological opinions of Dr. McGeady. As a pediatric neurologist, Dr. Shafrir may appropriately testify regarding neurological disease processes that intersect with immunology. However, to the extent his opinions depend upon principles of immunology, the undersigned affords greater weight to Dr. McGeady's testimony, which is grounded in decades of specialized training and experience in precisely this area.

**B. Causation in Fact**

Having considered the experts' respective qualifications, the undersigned next turns to the issue of causation beginning with Althen prong three analysis. Then, as part of the Althen prong two determination, diagnosis is addressed. Althen prong one is discussed last.

1. Althen Prong Three

Under Althen's third prong, a petitioner must establish both the "timeframe for which it is medically acceptable to infer causation" and that the onset of the alleged injury occurred within this period. Shapiro v. Sec'y of Health & Human Servs., 101 Fed. Cl. 532, 542-43 (2011), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd without op., 503 F. App'x 952 (Fed. Cir. 2013). Here, the parties agree that Mr. Perry's symptoms began approximately one month after his third HPV vaccination. Pet'r's Posth'g Br. at 73 n.32; Resp't's Posth'g Br. at 68. The dispute is therefore limited to whether that interval constitutes a medically acceptable timeframe for the alleged injury.

Mr. Perry proposes that the window of biological plausibility for autoimmune neurological reactions to HPV vaccination spans a four- to 42-day-period post-vaccination. Pet'r's Posthearing Br. at 86-89. Mr. Perry bases his position principally on Slade et al.,[83] a post-marketing surveillance study that utilized a "biologically plausible" interval for autoimmune reactions between four and 42 days after HPV vaccination. Pet. Br. at 86-89. The Secretary characterized this timeframe as arbitrarily arrived at by the authors and not applicable to the facts of this case. Resp't's Posth'g Br. at 73-74 ("Dr. Shafrir put forward this time frame as ipse dixit… as there is no logical reason that it would be applicable to HPV or to [Mr. Perry's] neurological condition – particularly since… the [Slade et al.] article does not even mention [autoimmune encephalitis] or KLS").

Mr. Perry also relies on Hacohen et al.,[84] which notes that a single patient was considered to have a diagnosis of probable autoimmune encephalopathy whose symptoms reportedly began approximately four weeks after HPV vaccination. The Secretary, in turn, found this reference as insufficient for the purposes of establishing an appropriate timeframe. Resp't's Posth'g Br. at 74 ("[t]his passing reference to a single individual does not, by any stretch, establish an appropriate timeframe for onset of [autoimmune encephalitis] (or KLS) caused by HPV vaccination.").

[83] Exhibit 31 (Slade et al.) at 5, 8.

[84] Exhibit 43 (Hacohen et al.) at 3 (the authors do not extrapolate from this single report).

Although Mr. Perry's evidentiary support is not particularly robust, the Secretary does not identify more persuasive evidence demonstrating that an onset approximately one month after vaccination would be medically incompatible with autoimmune encephalitis or another comparable immune-mediated CNS process. Moreover, Vaccine Program decisions have accepted similar temporal intervals in certain cases involving HPV vaccination and alleged vaccine-mediated autoimmune injuries. E.g., Mager v. Sec'y of Health & Human Servs., 166 Fed. Cl. 414, 446-47 (2023) (ruling special master was not arbitrary in looking to Slade et al. based upon VAERS reports to find an appropriate temporal interval), appeal dismissed, 2023 WL 7318303 (Fed. Cir. Nov. 7, 2023); see also Simmons v. Sec'y of Health & Human Servs., No. 20-884V, 2025 WL 3896935, at *25_ (Fed. Cl. Spec. Mstr. Nov. 19, 2025); Girardi v. Sec'y of Health & Human Servs., No. 17-181V, 2024 WL 4565887, at *33 (Fed. Cl. Spec. Mstr. Sept. 27, 2024); Waterman v. Sec'y of Health & Human Servs., No. 13-44V, 2016 WL 761173, at *7 (Fed. Cl. Spec. Mstr. Feb. 5, 2016). Accordingly, the proposed timeframe is medically acceptable.

Satisfying Althen's third prong, however, establishes only that Mr. Perry's timing is consistent with his proposed theory of causation, but timing alone cannot demonstrate that the subject vaccination caused Mr. Perry's condition. Moberly, 592 F.3d at 1323 (quoting Althen, 418 F.3d at 1278, and Grant, 956 F.2d at 1148). The more significant questions presented in this case are whether Mr. Perry has established a reliable medical theory causally connecting the third HPV vaccination to the alleged injury and whether the evidence demonstrates a logical sequence of cause and effect. The undersigned next turns to those issues, beginning with the latter.

2. Althen Prong Two

To satisfy the second prong of Althen, a petitioner must demonstrate a logical sequence of cause and effect showing that vaccination was the cause-in-fact for the alleged injury. This inquiry is case-specific and requires proof that the proposed mechanism more likely than not occurred in the given case. Quintana v. Sec'y of Health & Hum. Servs., No. 15-1273V, 2022 WL 1873849, at *10 (Fed. Cl. 2022) ("The causal theory accepted under the first prong determines which theory of causation the special master must consider under the second prong."). Below, the undersigned begins with the alleged injury before considering whether the record establishes a logical sequence connecting that injury to the subject vaccination and before discussing the proposed mechanism.

Here, the parties dispute both the nature of Mr. Perry's condition (the alleged effect) and its cause. Mr. Perry principally contends that he developed autoimmune encephalitis following his third HPV vaccination. Pet'r's Posth'g Br. at 1, 47 (emphasizing that "[t]o be clear, petitioner does maintain his position that [Mr. Perry] suffered autoimmune encephalitis"). The Secretary, by contrast, argues that the evidence does not support autoimmune encephalitis and instead supports a diagnosis of KLS, likely exacerbated by intervening viral infections and by Mr. Perry's purportedly undertreated moderate obstructive sleep apnea. Resp't's Posth'g Br. at 50, 51, 56, & 57-58 ("There is no indication of brain inflammation and [Mr. Perry] does not meet the diagnostic criteria for [autoimmune encephalitis]" but that "the relevant evidence indicates that [he] very likely suffered from KLS" and that "his ongoing decreased energy level and cognitive

performance was likely due at least in part to his moderate obstructive sleep apnea" and exacerbations triggered by various infectious illnesses throughout the subject period).

Although the parties devote substantial attention to the question of diagnosis, resolution of that dispute is not necessary to decide this case. In some circumstances, where the existence or nature of an alleged injury is disputed, a special master may first determine which diagnosis is best supported by the evidence before conducting the causation analysis. Broekelschen v. Sec'y of Health and Human Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010). Here, the case may be resolved without definitively determining whether Mr. Perry's condition is most accurately classified as autoimmune encephalitis, a broader autoimmune neurologic disorder, or KLS. See Andreu, 569 F.3d at 1382 (quoting Knudsen v. Sec'y of Health and Human Servs., 35 F.3d 543, 549 (Fed. Circ. 1944)) (observing that the role of special master is not to diagnose vaccine-related injuries, but to determine whether the evidence establishes that a vaccine caused the injury alleged).

Accordingly, the undersigned considers, solely for the purposes of the discussion of diagnosis and Althen prong two, that Mr. Perry alleges that he experienced a nonspecific autoimmune CNS process, which would encompass autoimmune encephalitis. See exhibit 78 at 15 (Dr. Shafrir considering whether to apply the more general term); Pet'r's Posth'g Br. at 45-46 (Mr. Perry states that Dr. Shafrir regards the term to be "mutually agreeable" between Drs. Shafrir and Wirrell); but see exhibit B at 18-19 (Dr. Wirrell expanding the scope of her analysis from the specific diagnosis of autoimmune encephalitis to consider the broader category of "autoimmune central nervous system process" and concluding that Mr. Perry's condition does not fit either classification).

This approach relieves Mr. Perry of establishing the diagnostic criteria associated with pediatric autoimmune encephalitis. Even under that broader framing, however, Mr. Perry must still establish, by preponderant evidence, that he suffered from an autoimmune CNS process caused by his third HPV vaccination.

*Evidentiary Support for an Autoimmune CNS Process*

To support the assertion that he suffered an autoimmune injury, Mr. Perry principally relies upon three categories of evidence: mildly elevated CSF protein, abnormal EEGs, and his treating providers' favoring an autoimmune etiology over alternative processes and their use of immunotherapy. Pet'r's Posth'g Br. at 80-86. Considered individually and collectively, however, these findings provide only limited and nonspecific support that he suffered from an autoimmune process.

CSF Protein. Both Drs. Wirrell and Shafrir confronted the finding of abnormal CSF protein levels, yet neither offered a fully satisfying explanation. Dr. Shafrir viewed the abnormality as supportive of an ongoing inflammatory process and therefore consistent with autoimmune encephalitis. Exhibit 24 at 48-49. Dr. Wirrell disagreed, testifying that elevated protein without pleocytosis is not, standing alone, evidence of CNS inflammation, much less autoimmune encephalitis. Tr. at 208:11-18. She explained that autoimmune encephalitis is typically associated with intrathecal IgG production, manifested by elevated IgG index,

increased IgG synthesis, or oligoclonal bands, none of which were present here. Exhibit B at 22. She further opined that Mr. Perry's elevated CSF protein, particularly in the form of albumin, points away from a CNS autoimmune process. Id. Nevertheless, Dr. Wirrell did not offer a definitive alternative explanation for the abnormality, acknowledging that isolated elevations in CSF protein frequently remain unexplained.[85] Id. at 19.

Although Dr. McGeady likewise did not resolve the issue he emphasized that Mr. Perry underwent extensive evaluation for autoimmune encephalitis and that no pathogenic neural antibodies were identified despite testing directed toward that question. Exhibit D at 2. In his view, this evidentiary gap substantially weakened Mr. Perry's claim of suffering from specifically autoimmune encephalitis. Id.

The undersigned is persuaded by the Secretary's experts' interpretations of Mr. Perry's CSF testing and related studies. Mild elevations in CSF protein levels, standing alone without accompanying pleocytosis or other more persuasive markers of CNS inflammation, do not support a finding that Mr. Perry more likely than not experienced an autoimmune condition. See also Tr. at 126:16-127:12 (Dr. Shafrir acknowledging that elevated CSF protein would not rule out a diagnosis of KLS, an idiopathic condition) & 208:9-211:4 (Dr. Wirrell noting that underlying causes are often never discovered in patients with mild elevations in CSF proteins).

EEG Findings. The EEG findings, which were often unremarkable,[86] reflect intermittent abnormal neurologic activity, but such findings may be observed in numerous neurological disorders and accordingly do not point to a definitive cause. E.g. exhibit 3 at 61-64 (Mr. Perry's initial EEG was abnormal and was interpreted as a nonspecific indicator of focal cerebral dysfunction, most commonly associated with structural abnormalities, but also seen in potentially reversible conditions such as postictal states or migraines.) As Dr. Wirrell persuasively explained, the abnormalities identified on Mr. Perry's EEGs are not indicative of autoimmune encephalitis, as they do not demonstrate the pattern typically expected in cases of autoimmune encephalitis. Exhibit F at 2 (noting that the majority of cases of encephalitis with altered awareness more typically produce diffuse background slowing, whereas Mr. Perry's was within normal limits). Thus, while the abnormal EEGs confirm that Mr. Perry displayed abnormal neurologic activity at certain times, they do not persuasively identify autoimmunity as the underlying mechanism, much less that he suffered from specifically autoimmune encephalitis.

Treating Doctors. Mr. Perry also emphasizes the fact that multiple treating providers considered an autoimmune etiology and ultimately prescribed corticosteroids, IVIG, PLEX, and other immunosuppressive therapies. Pet'r's Posth'g Br. at 59-66. The contemporaneous record, however, reflects that these treatments were undertaken cautiously and largely empirically while

[85] Exhibit b, tab 7 (John A. Brooks et al., Causes of Albuminocytological Dissociation and the Impact of Age-Adjusted CSF Protein Reference Intervals: A Retrospective Chart Review of 2627 Samples Collected at Tertiary Care Centre, 9 BMJ Open (2019)) at 1, 3 (concluding that elevated CSF protein is a common finding with a range of underlying causes).

[86] Of the approximate eleven EEGs documented in the record, three were abnormal. Exhibit 3 at 61-64 (July 2, 2015); exhibit 3.3 at 1130-33 (August 19, 2015); exhibit 76 at 96 (November 17, 2017).

considering other possibilities and pursuing treatments outside of immunotherapy. E.g., exhibit 3.3 at 1155 (the neurology service elected to initiate an empiric course of steroids). Moreover, the records do not persuasively demonstrate that Mr. Perry's subsequent clinical course was responsive to the administration of immunotherapies. See exhibit F at 3-4. At various points, Mr. Perry improved with observation alone,[87] while other periods of improvement and deterioration occurred independent of treatment. Id; Tr. at 215:17-220:15. As Dr. Wirrell persuasively explained, Mr. Perry's recurrences and rapid fluctuations during episodes do not resemble a clinical course typical of autoimmune encephalitis. Tr. at 171:20-172:24. Likewise, the escalation in immunotherapy did not produce the durable improvement one would expect to observe if an active autoimmune process were producing Mr. Perry's symptoms. Id. at 218:11-219:6.

Taken together, the evidence establishes that Mr. Perry experienced neurologic symptoms, but it does not establish, by preponderant evidence, that autoimmunity more likely than not caused Mr. Perry's initial presentation, subsequent exacerbations, or residual symptoms, much less that he suffered from autoimmune encephalitis.

*Evidentiary Support for a Vaccine-Mediated Process*

Even assuming Mr. Perry experienced an autoimmune CNS disorder, he must still demonstrate a logical sequence connecting that disorder to his third HPV vaccination. Mr. Perry principally relies upon two individualized theories: that he possessed a unique susceptibility to vaccine-induced autoimmunity and that his first two HPV vaccinations primed his immune system such that the third vaccination triggered a pathogenic reaction.

Mr. Perry's susceptibility theory rests largely upon his past medical history of asthma, allergies, and eczema and the fact that his sister reportedly developed similar neurologic symptoms after receiving her third HPV vaccination. Tr. 149:11-150:6 (Dr. Shafrir opining that although there is a lack of "direct evidence" that Mr. Perry is predisposed to develop an autoimmune reaction, "there is highly suggestive evidence for that," in the form of his "multiple immune-related diseases" and his sister having experienced "an unusual reaction to the HPV vaccination in exactly the same time frame as [Mr. Perry].").

The evidence supporting this theory, however, is unpersuasive. Mr. Perry's treating physicians did not attribute his illness to vaccination, much less identify an inherited immune abnormality predisposing him to vaccine-induced autoimmunity. Contra Pet'r's Posth'g Br. at 80-81 (stating that "[Mr. Perry's] treating physicians provide support of a logical sequence of cause and effect between his HPV vaccination and his autoimmune encephalitis," however, listing only instances where a temporal relationship was noted). Nor did Mr. Perry identify any genetic condition that would explain such susceptibility. See Tr. at 150:7-12 (Dr. Shafrir acknowledging that he "[surmised] that [Mr. Perry] has genetic factors that predispose him to autoimmunity" without "any testing in this case"). Likewise, the evidence concerning Mr. Perry's sister is too limited to establish a shared vaccine-related susceptibility, particularly where

[87] E.g., exhibit 3.1 at 160, 162 (Mr. Perry received no immunotherapy, returned to baseline, and was discharged from his first hospitalization approximately 38 days post-vaccination, at which point his treating physician suggested that his symptoms were "possibly secondary to a viral syndrome").

alternative explanations (e.g., a contemporaneous infectious illness) remain equally, if not more, plausible.

Mr. Perry further contends that his first two HPV vaccinations primed his immune system and that his third vaccination ultimately triggered an autoimmune response. Although Mr. Perry does not expressly invoke a challenge-dechallenge-rechallenge theory, his priming hypothesis is conceptually similar in that it relies on the differing effects of successive vaccine doses. Here, however, both Dr. Shafrir and Mr. Perry's mother acknowledged that Mr. Perry experienced no adverse reaction following his first or second HPV vaccinations. Tr. at 45:1-19 (Mrs. Tammie Perry), 149:3-10 (Dr. Shafrir). Thus, the record lacks the type of escalating or reproducible pattern that ordinarily lends support to a challenge-dechallenge-rechallenge theory.

The undersigned has previously recognized that persuasive evidence of a challenge-rechallenge sequence may satisfy a petitioner's burden to present a logical theory causally connecting a vaccine and an alleged injury. See e.g., Mager v. Sec'y of Health & Human Servs., No. 14-820V, 2022 WL 1495534, at *31 (Fed. Cl. Apr. 19, 2022) (citing Waterman v. Sec'y of Health & Human Servs., No. 13-44V, 2016 WL 761173, at *7-8 (Fed. Cl. Spec. Mstr. Feb. 5, 2016)). No such sequence exists here. Instead, Mr. Perry appears to argue that each successive HPV vaccination predictably increased antibody production and/or accumulation until the third dose brought about a "peak antibody concentration" sufficient to provoke autoimmunity. See Pet'r's Posth'g Br. at 73.

Dr. McGeady persuasively explained, however, with progressively higher levels of allegedly autoreactive antibodies, it would be "counterintuitive" that Mr. Perry would remain asymptomatic during the month-long post-third-vaccination interval, rather than experience worsening symptoms. Exhibit D at 5-6. Dr. McGeady also noted that such a heightened response in terms of antibody production and accumulation is the intended effect of a multidose vaccination series. See Tr. at 110:17-20 (Dr. McGeady indicating that the purpose of "booster" vaccinations is to augment the vaccinee's immune response). Absent evidence that the third dose produced a qualitatively different immune response, Mr. Perry's priming theory remains unpersuasive.

Accordingly, Mr. Perry has not established a logical sequence of cause and effect. The evidence does not persuasively demonstrate that Mr. Perry experienced a nonspecific autoimmune CNS process, much less that he suffered from specifically autoimmune encephalitis, nor does it persuasively demonstrate that the third HPV vaccination initiated or materially contributed to such an injury. Mr. Perry's individualized theories of susceptibility and immune priming likewise remain unsupported by the contemporaneous medical record and are further diminished by the persuasive immunology testimony offered by Dr. McGeady. Mr. Perry therefore has not satisfied Althen's second prong.

The undersigned next considers the antecedent and more general question whether Mr. Perry has offered a reliable medical theory explaining how HPV vaccination can cause the type of autoimmune CNS injury alleged.

3. Althen Prong One

To satisfy the first Althen prong, petitioners must establish a reliable medical theory causally connecting the vaccination and the alleged injury. Although petitioners need not demonstrate scientific certainty, the proposed mechanism must be supported by a reputable medical or scientific explanation and proven by a preponderance of the evidence. See also Cedillo v. Sec'y of Health & Human Servs., 617 F.3d 1328, 1339 (Fed. Cir. 2010) (special master is permitted to decide whether there is too great an analytical gap between experts' data and their conclusions) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). Where petitioners fail to establish such a theory, compensation cannot be awarded. Boatmon v. Sec'y of Health & Human Servs., 941 F.3d 1351, 1359 (Fed. Cir. 2019) (quoting Knudsen, 35 F.3d at 548-49).

*Molecular Mimicry*

Molecular mimicry originated as a theory to explain how infectious organisms can evade the immune system of human beings. Exhibit D, tab 12 (Kanduc) at 3. The theory proposed that infectious organisms would benefit from resembling host tissues because the host's immune system would not be designed to attack host tissues. Id. The theory of molecular mercury evolved when "in 1962 [researchers] suggested that infections might lead to autoimmune disease as a result of cross-reactive antibodies or T cells." Id. (citations omitted). This iteration of the molecular mimicry concept proposed that the immune system *sees*, *recognizes*, and *attacks* an infectious agent's pathogenic amino acid sequences as well as host tissues displaying the same sequences, thus breaking the "host immunotolerance status" culminating in autoimmune disease. Id.

Here, Dr. Shafrir referenced articles[88] supporting the existence of segments of homology between the HPV vaccine and brain proteins but acknowledged that "linear homology is not a proof of molecular mimicry." Exhibit 78 at 18. He also cited Luo et al.,[89] Ahmed et al.,[90] and Kornum et al.[91] as support for the possibility that molecular mimicry could give rise to autoimmunity following vaccination. Exhibit 78 at 18-19. These articles, however, do not implicate specifically the HPV vaccine or link the HPV vaccine to autoimmune encephalitis, and

---

[88] Exhibit 36 (Kanduc, Quantifying the Possible Cross-Reactivity Risk of an HPV16 Vaccine); exhibit 37 (Kanduc & Shoenfeld).

[89] Exhibit 93 (Guo Luo et el., Autoimmunity to Hypocretin and Molecular Mimicry to Flu in Type 1 Narcolepsy, 115 Proceedings National Academy Sciences E12323 (2018)) at 1 ("Our results provide evidence for autoimmunity and molecular mimicry with influenza antigens modulated by genetic components in the pathophysiology of [Type 1 narcolepsy].").

[90] Exhibit 94 (Syed S. Ahmed et al., Antibodies to Influenza Nucleoprotein Cross-React with Human Hypocretin Receptor 2, 7 Science Translation Medicine 1 (2015)) at 1 (data support molecular mimicry as a possible explanation for the temporal association between a particular influenza vaccine (Pandemrix), which was given in response to the 2009 H1N1 influenza pandemic, and increased reports of narcolepsy).

[91] Exhibit 95 (Birgitte R. Kornum et al., Narcolepsy with Hypocretin/Orexin Deficiency, Infections and Autoimmunity of the Brain, 21 Current Opinion in Neurobiology 897 (2011)) at 1 (data support a robust seasonality of narcolepsy onset in association with H1N1 vaccination, pointing towards processes such as molecular mimicry or bystander activation as crucial for disease development).

Dr. Shafrir acknowledged that "elaborate studies were not performed on the HPV vaccine." Id. at 19.

*Appellate Precedents on Molecular Mimicry*

Because special masters are often called upon to evaluate the persuasiveness of the theory of molecular mimicry, the Court of Federal Claims and the Court of Appeals for the Federal Circuit have considered molecular mimicry in their appellate role. In December 2019, the undersigned identified the leading precedents as W.C. v. Sec'y of Health & Human Servs., 704 F.3d 1352 (Fed. Cir. 2013) and Caves v. Sec'y of Dep't. of Health & Human Servs., 100 Fed. Cl. 119 (2011), aff'd sub nom., 463 F. App'x 932 (Fed. Cir. 2012). Tullio v. Sec'y of Health & Human Servs., No. 15-51V, 2019 WL 7580149, at *12-14 (Fed. Cl. Spec. Mstr. Dec. 19, 2019), mot. for rev. denied, 149 Fed. Cl. 448 (2020). While Tullio describes those cases in more detail, their essence appears to be that although molecular mimicry is accepted in some contexts, special masters may properly require some evidence to show that a particular vaccine can cause a particular disease.

In the next approximately four years, appellate authorities reviewing decisions involving molecular mimicry have generally endorsed the approach of looking for some evidence that persuasively shows that a portion of a vaccine resembles a portion of human tissue, which contributes to causing the disease, and that the immune system will respond to the relevant amino acid sequence. Chronologically, the list of more recent appellate cases begins with the opinion in Tullio, where a motion for review was denied. 149 Fed. Cl. 448, 467-68 (2020).

Another example in which the Court of Federal Claims held that the special master did not elevate the petitioner's burden of proof in the context of evaluating the theory of molecular mimicry is Morgan v. Sec'y of Health & Human Servs., 148 Fed. Cl. 454, 476-77 (2020), aff'd in non-precedential opinion, 850 F. App'x 775 (Fed. Cir. 2021). In Morgan, the Chief Special Master found that petitioner had not presented persuasive evidence about a relevant antibody. Id. at 477. The Chief Special Master also noted that the articles about the relevant disease do not list the wild influenza virus as potentially causing the disease. Id. When examining this analysis, the Court of Federal Claims concluded: "the Chief Special Master did not raise the burden of causation in this case; petitioner simply failed to meet it." Id.

The Federal Circuit also evaluated the Chief Special Master's approach in Morgan. The Federal Circuit concluded: "We discern no error in the special master's causation analysis." 850 F. App'x 775, 784 (Fed. Cir. 2021).

Most other recent appellate cases follow this path. E.g., Dennington v. Sec'y of Health & Human Servs., 167 Fed. Cl. 640, 653-56 (2023) (finding special master did not err in rejecting theory of molecular mimicry where petitioner did not specifically link vaccine and injury), appeal dismissed, No. 2024-1214, 2024 WL 1255318 (Fed. Cir. Mar. 25, 2024); Duncan v. Sec'y of Health & Human Servs., 153 Fed. Cl. 642, 661 (2021) (finding special master did not err in rejecting a bare assertion of molecular mimicry); Caredio v. Sec'y of Health & Human Servs., No. 17-79V, 2021 WL 6058835, at *11 (Fed. Cl. Dec. 3, 2021) (indicating that special master did not err in requiring more than homology and citing Tullio); Yalacki v. Sec'y of Health &

Human Servs., 146 Fed. Cl. 80, 91-92 (2019) (ruling that special master did not err in looking for reliable evidence to support molecular mimicry as a theory); but see Patton v. Sec'y of Health & Human Servs., 157 Fed. Cl. 159, 169 (2021) (finding that special master erred in requiring petitioner submit a study to establish medical theory causally connecting influenza vaccine to brachial neuritis).

*Mr. Perry's Theory*

This background information about molecular mimicry and how appellate authorities have treated molecular mimicry is helpful to understanding the way Dr. Shafrir attempted to connect the HPV vaccine and autoimmune encephalitis. Here, Mr. Perry's theory proceeds as follows: because the HPV vaccine elicits an unusually robust adaptive immune response, a third HPV vaccination is especially capable of provoking a dysregulated immune response that, through molecular mimicry or a similar immunologic mechanism,[92] results in pathogenic antibodies that cross-react with host neural tissue. According to Mr. Perry, reported peptide homologies between HPV vaccine antigens and human proteins provide the biological basis for that mechanism. Pet'r's Posth'g Br. at 72-79.

The Secretary does not materially dispute the first premise of Mr. Perry's theory. Resp't's Posth'g Br. at 72. The evidence demonstrates that the HPV vaccine is highly immunogenic and generates antibody concentrations that may exceed those produced by wild HPV infection.[93] Additionally, Dr. McGeady acknowledged that the third HPV vaccination in the series may lead to peak antibody concentrations. Tr. at 400-01. The parties diverge, however, on the significance of these facts. Mr. Perry offers no persuasive evidence that a robust antibody response following a third exposure to the HPV vaccination corresponds to a greater likelihood of autoimmunity. Dr. McGeady noted that "[t]he immune response to antigens is known to be accelerated by repeated exposures" and opined that "to propose that the kinetics of an adverse immune reaction to a neoantigen would be the same as that of an antigen being received for the third time, would be unreasonable." Exhibit G at 2. If that were the case, it would seem that one would become symptomatic following a second exposure and/or more quickly following a third exposure.

Nor does Mr. Perry's reliance on peptide homologies establish a reliable causal theory. Dr. McGeady persuasively explained that shared amino acid sequences, standing alone, do not demonstrate clinically meaningful cross-reactivity. Tr. at 374:2-376:7. Rather, immune recognition depends principally upon the three-dimensional configuration of the relevant epitopes. Id. Mr. Perry presented insufficient evidence demonstrating that the HPV vaccine antigens may share any three-dimensional structural similarities with human neural proteins necessary to produce the autoimmune process alleged. Indeed, Dr. McGeady noted that even the

[92] As the Secretary points out, Mr. Perry and Dr. Shafrir also allege that epitope spreading, bystander activation, and polyclonal activation may be implicated, but Dr. Shafrir has not meaningfully elaborated on these mechanisms. Resp't's Posth'g Br. at 6 n.9; exhibit D at 6; Tr. at 376:8-377:6; see also Pet'r's Posth'g Br. at 74; exhibit 24 at 49; Tr. at 97:16-99:23 (Dr. Shafrir acknowledging that there is no "model" mechanism that could cause autoimmunity that is "fool proof").

[93] Exhibit 32 (Stanley) at 4 (noting the highly immunogenic nature of the HPV vaccine); exhibit 33 (Mariani & Venuti) at 3 (noting the highly immunogenic nature of the HPV vaccine).

author cited by Mr. Perry acknowledged that direct evidence establishing such pathogenic cross-reactivity remains lacking.[94] Id. at 373:2-374:1.

The submitted medical literature likewise does not bridge the evidentiary gap.[95] Mr. Perry's exhibits include theoretical papers discussing molecular mimicry and other proposed mechanisms by which infections or vaccinations may, under certain circumstances, contribute to autoimmune disease.[96] Those publications establish that such mechanisms have been hypothesized within the scientific community. They do not sufficiently support a conclusion that HPV vaccination more likely than not causes autoimmune encephalitis through those mechanisms.

To the extent Mr. Perry relies on case reports, such evidence supports temporal associations, rather than causal relationships, particularly where the items of medical literature do not discuss the subject vaccine or the alleged injury. See Tr. at 244:23-245:13 (Dr. Wirrell, who is actively involved with editing scholarship in the field of pediatric neurology, explaining that a case report "does not provide any data on causality."); see also, K.O. v. Sec'y of Health & Hum. Servs., No. 13-472V, 2016 WL 7634491, at *11-12 (Fed. Cl. Spec. Mstr. July 7, 2016) (discussing appellate precedent on case reports). By contrast, Dr. Wirrell cites more robust studies that fail to show any statistically significant association between the HPV vaccine and the alleged injury.

Ultimately, Mr. Perry's theory rests upon a series of accepted immunological concepts connected by inferences offered by Dr. Shafrir. The record supports that HPV vaccination produces a vigorous immune response and that molecular mimicry is one hypothesized mechanism by which autoimmune disease may arise. It does not support the conclusion that the robust immune response elicited by HPV vaccination is more likely than not capable of producing autoimmune encephalitis. At most, Mr. Perry has demonstrated a biological possibility

---

[94] Moreover, peptide homology is not uniquely consistent with Mr. Perry's theory. As discussed in one of Professor Kanduc's articles filed in this matter, the concept of molecular mimicry has historically been invoked both to explain proposed mechanisms of autoimmune disease and, conversely, to explain microbial evasion of host immune surveillance. Exhibit D, tab 12 (Kanduc) at 3. Accordingly, the identification of shared peptide sequences does not itself support one hypothesis over the other. Id. at 3. Thus, even assuming such homologies exist, they do not inherently support the inference that a heightened autoimmune response will occur. The lack of evidence supporting Mr. Perry's proposed mechanism is reflected in the clinical record as well. Despite repeated evaluation for autoimmune encephalitis, no pathogenic antibodies were identified, and Mr. Perry's response to immunotherapies was equivocal. Although these case-specific facts bear more directly on Althen prong two, they underscore the absence of evidence that the hypothesized mechanism was implicated in Mr. Perry's course.

[95] The absence of stronger supporting evidence is notable given the widespread administration of HPV vaccines and the substantial scientific attention devoted to vaccine safety. See exhibit 31 (Slade et al.).

[96] E.g. exhibit 39 (Srdja Janković, Vaccination and Autoimmune Phenomena, 13 Central Eur J Paed 12 (2017)) at 1 (noting that "the potential of vaccines to trigger autoimmunity is largely the consequence of the fact that vaccines, in order to be effective, must elicit some (although preferably subclinical) degree of inflammatory reaction," and that one of potential mechanisms of initiating an autoimmune response by vaccination at the level of adaptive immunity is *molecular mimicry*). Although the theoretical possibility cannot be excluded, Janković finds that clearly established examples are "rare rather than common." Id. at 2.

of this relationship. The Vaccine Act, however, requires demonstration of biological probability. Accordingly, Mr. Perry has not satisfied the first prong of Althen.

## VI. Conclusion

Regardless of the diagnosis given for Mr. Perry's condition, the medical records indicate that his condition has caused him a tremendous amount of trouble. Mr. Perry and his family are entitled to sympathy for their suffering. However, special masters are required to resolve cases based upon evidence, not emotion. In this case, the evidence does not preponderate in Mr. Perry's favor.

After consideration of the entire record, I find that Mr. Perry has not established entitlement to compensation under the Vaccine Act. Mr. Perry has not demonstrated, by a preponderance of the evidence, that the subject vaccine caused his alleged injury. Accordingly, the claim is denied.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

**IT IS SO ORDERED.**

s/ Christian J. Moran
Christian J. Moran
Special Master